**KEARNEY & TRECKER CORP.**

v.

**NATIONAL LABOR RELATIONS BOARD.**

No. 10789.

United States Court of Appeals, Seventh Circuit.

Feb. 26, 1954.

Rehearing Denied April 5, 1954.

See also 209 F.2d 782.

Robert N. Denham, Washington, D. C., Leon B. Lamfrom, Milwaukee, Wis., Lamfrom, Tighe, Engelhard & Peck, Milwaukee, Wis., and Denham & Humphrey, Washington, D. C., for petitioner.

David P. Findling, Associate General Counsel, George J. Bott, General Counsel, A. Norman Somers, Asst. General Counsel, Duane Beeson, Attorney, National Labor Relations Board, Washington, D. C., for respondent.

Sydney M. Eisenberg, Milwaukee, Wis., for Employees Independent Union at Kearney & Trecker.

Max Raskin, Milwaukee, Wis., for Kearney-Trecker Employees Local 1083 UAW, CIO.

Before MAJOR, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

This case is here on petition of Kearney & Trecker Corporation (hereinafter referred to as petitioner or the company), to review and set aside an order of the National Labor Relations Board issued against it on December 31, 1952, following the usual proceedings under Sec. 10(c) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq. In its answer, the Board requested enforcement of its order. The order directs petitioner to cease and desist from refusing to bargain collectively with Local 1083 of United Automobile, Aircraft & Agricultural Implement Workers of America, CIO (hereinafter referred to as Local 1083 or CIO), pursuant to a certification of that union as the exclusive bargaining representative of the company's production and maintenance employees, entered on November 2, 1951, as the result of an election conducted by the Board on September 12, 1951. Admittedly the company has refused to bargain with Local 1083 but seeks to justify such refusal on the ground that the Board's certification of that Local was invalid for reasons which will subsequently be stated and discussed. A phase of this case relative in the main to the procedure employed by the Board in its conduct of the investigation and hearing which led to the Board's decision calling for an election has heretofore been considered and decided by this court. Kearney & Trecker Corp. v. National Labor Relations Board, 7 Cir., 209 F.2d 782.

The company's refusal to bargain as directed may be generalized under two categories, (1) that Direction of Election by the Board was erroneous, and (2) that the election was conducted under such circumstances as to invalidate the

result. We shall later consider these issues in more detail.

We have accorded a great deal of study to the voluminous record before us but, in view of the conclusion which we have reached, we think that a relatively brief statement of the facts will suffice.

In 1945, Employees Independent Union (hereinafter called EIU) was certified by the Board and recognized by the company as the bargaining representative of its approximately 1500 employees. During this period EIU was affiliated with Confederated Unions of America (hereinafter called CUA), but conducted negotiations and made contracts with the company through its own officers exclusively. Following bargaining negotiations during the spring of 1950, EIU and the company executed a collective agreement on July 2, 1950, extending for a period of two years, with a provision for reopening wage rates after the end of the first year.

There commenced in September, 1950, a succession of events which supply the ammunition for this unfortunate controversy. Rather than delay all expression of opinion until after we have stated the facts, we think it would be appropriate, at least in some instances, to express our views concerning these various incidents as we go along. A regular meeting of the EIU was held September 10, 1950, the announced agenda for which was the election of delegates to the annual convention of the CUA. The president of EIU at that time, as the presiding officer at this meeting, was Elmer De-Witte. According to the minutes, a motion to send a delegate to the CUA convention was ruled out of order by the chairman, and this notwithstanding that the meeting was called for that purpose. A motion not to send a delegate was carried. A motion "that we disaffiliate from the CUA" was carried. The minutes do not disclose the number in attendance at this meeting, but there is oral testimony to the effect that 41 members were registered, of whom 22 were identified as officers of EIU. Predicated solely on the action taken at this meeting, the officers of EIU returned its charter to CUA, with notification of disaffiliation. At the time of this meeting and the action thus taken, EIU had 580 dues-paying members, which number was increased to 959 by the following month. Shortly after this meeting, a group of EIU members notified the headquarters of CUA of what had happened and requested a return of the charter, which was done. That charter is still in existence and EIU has continued to function as a labor organization.

■ It is self evident, we think, that the action taken at the September meeting insofar as any disaffiliation is concerned was void and of no effect and that the attempted surrender of the charter of EIU must be similarly characterized. EIU meetings were held on November 5 and December 17, 1950, and January 7, 1951, the details of which are not important other than that they show that the matter of disaffiliation was a live subject. At the last named meeting, it was decided to call a special meeting for the purpose of hearing representatives of international labor organizations. This meeting was called for January 21, 1951, and notices were distributed throughout the plant which stated, so far as now pertinent, "The purpose of this meeting is to definitely determine the wishes of the members of the Employees Independent Union, by majority decision, as to whether the necessary processes should be instituted which would result in affiliation with one of the larger, national organizations." At this meeting, a motion to set a date for a special meeting for the sole purpose of voting on which union to affiliate with was withdrawn and it was requested that the balloting proceed. The result was 68 votes for CIO, 28 votes for AFL and 3 votes for EIU. It will be noted that the membership of EIU had no notice that the special meeting of January 21 was for the purpose of voting upon affiliation with an international union, and neither was this special meeting called for such purpose, but only to determine "whether the necessary processes should be instituted which would re-

sult in affiliation" with one of such organizations.

We think it open to serious question whether the result of the vote thus taken, under the circumstances related, had any binding effect upon members of EIU who were not present. True, it is claimed they had notice of the meeting and an opportunity to be present and be heard, but the point is, they had no notice that a vote upon such an important step would be taken at that meeting, and neither was the action thus taken within the stated purpose for which the meeting was called. Thereupon, as stated by the Board in its Decision and Direction of Election, "The officers of the E. I. U. thereupon applied for a charter from the U. A. W.-C. I. O. On March 4, the charter was received. The organization thus formed was thereafter known as Local 1083 (the Petitioner herein). A majority of the officers of the E. I. U., including Elmer DeWitte, its president, continued in the same offices in Local 1083, without any new general election." And as stated by the Board in its brief, "Immediately following the formal organization of Local 1083, its officers took steps to align the operations of their union with its new status. Thus, on March 5, 1951, the lock on the door of the union's office was changed, and a formal transfer was made to Local 1083 of all assets which had belonged to E. I. U. Similarly, on March 20 [1951], notice was given to the Company that all deductions of union dues from wages should be delivered to the treasurer of Local 1083." It might be added that the assets transferred by DeWitte and his group as former officials of EIU to themselves as officials of Local 1083 consisted of about $32,500 in cash and government bonds and some $9,300 cash from a commissary fund. After this transfer was made and the locks on the door changed, neither EIU members nor their officers were permitted to have access to books, records or other properties.

It is urgently insisted by Local 1083 that there was never but one union in the plant and that the controversy arose between factions, in other words, that Local 1083 was only a successor to EIU and that when the former was organized the latter passed out of existence. It states in its brief, "The present officers of * * * Local 1083 * * * have at all times since their election in November, 1950, been legally and factually in possession and occupation of the offices of the union," and "All of the property of the union was at all times since their election in November, 1950, legally and factually in the possession and under the control of the officers of the Employees Independent Union which changed its name to * * * Local 1083 * * *." This theory that Local 1083 was not a separate and independent labor organization but that it merely supplanted or was a successor to EIU evidently is important to Local 1083 because, otherwise, how could it justify the alleged seizure of the money, property, books, records and office of EIU?

On March 9, 1951, Local 1083 petitioned the Board to amend the certification issued in 1945, by which EIU had been named bargaining representative of the company's employees and to substitute the name "Local 1083" for EIU on the ground that the latter organization had changed its name. This petition was denied by the Board, "for the reason that over six years have elapsed since the issuance of the certificate herein," which no doubt was a good reason, but an equally good reason would have been that Local 1083 had made no showing that the situation was as represented by it.

In reading the Board's brief we have difficulty in determining whether it stands for the theory of one or two unions; however, an election was called, as stated in the Board's Direction of Election, "to determine whether they [employees] desire to be represented, for purposes of collective bargaining by Local 1083, International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, C. I. O. or by Employees Independent Union, affiliated with Confederated Unions of America, or by neither."

■ At the Board directed election held September 12, 1951, there were 1,-504 eligible voters, of whom 752 cast votes for Local 1083 and 588 cast votes for EIU (a few ballots were cast against participating with any labor organization and some ballots were void). Thus, Local 1083 obtained a clear majority of the eligible voters. The point now, however, is that the Board on the form of ballot prepared by it afforded the employees an opportunity to vote for one or the other of these two unions. This action of the Board in its call for an election and in the form of ballot submitted certainly is inconsistent with the theory advanced by Local 1083 that there was only a single union and that it was merely a successor to EIU, and well it might be because, in our view, there is not a particle of merit to the contention advanced by Local 1083 on this score. From what we have heretofore shown, we seriously question if there ever was any action taken by EIU, binding upon its members, authorizing affiliation with the CIO. Of course, those who desired, including DeWitte and his group, had a right to change their affiliation any time they saw fit, but we think they had no right under the circumstances to take along with them some six or seven hundred members of EIU. And even if it be assumed that they did, they had no authority to change the name of the union from EIU to Local 1083. What they did was to form a new union under the pretext of its being a successor to the old. They were not even elected officers of Local 1083, and their claim that they were officers of that union by reason of their election in November, 1950, as officers of EIU, borders on the preposterous. The members of EIU elected DeWitte and the other officials to serve as officers of that union, but not a single member has voted for them to serve as officials of a different union. They were self-appointed officials of Local 1083, and at most they were nothing more than de facto officers.

A few words now concerning EIU. As might be expected, its activities were stymied and its members thrown into a state of confusion by the activities of those who left the organization and affiliated with Local 1083, as above related. Particularly was this so inasmuch as those who left included most of the elected officials of EIU. However, for reasons above shown, the attempt to surrender the CUA charter was abortive and EIU continued to operate under and recognize it. Shortly after the January 21, 1951 meeting, members of EIU obtained 160 signatures to a resolution ousting DeWitte and other former EIU officials who had gone over to Local 1083. In March, 1951, EIU elected new officials to take the place of those who had left. At a meeting on April 8, 1951, formal action was taken to expel from membership the former officers who had gone over to Local 1083, and formal action was taken repudiating all previous actions regarding disaffiliation with CUA. After the September, 1950, meeting and through January, 1951, the officers and bargaining committee who in the main were those who had quit the EIU continued to meet regularly with officials of the company, without notifying it or making any public announcement of any change in their status. During that time the company had no knowledge of the alleged change which had taken place. The company did not acquire this knowledge until January 27, 1951, and it was not until February 8, 1951 that DeWitte as president of Local 1083 requested permission for Mr. Cappel, a representative of the CIO, to sit in with the bargaining committee in its meeting with the company. This request was denied, with a statement by the company that it would continue to bargain and negotiate with EIU. This position of the company was continuously maintained until August, 1951, when there was an order of the Board directing an election, with the exception of the period between March 9, 1951, when Local 1083 filed with the Board its petition seeking to have Local 1083 substituted for EIU, and March 22, 1951, when the request contained in that petition was denied by

the Board. The company at all times refused to bargain with Local 1083 and, with the exception noted, continuously met and bargained with the committee of EIU.

 The company in its attack upon the Board's calling of an election seeks to invoke the Board's so-called "contract bar policy." This contention is predicated upon the theory that at the time of the hearing in the representation proceeding, the company had a contract with EIU, dated July 2, 1950, for a duration of two years, and that such contract was sufficient under the Board's decisions to justify its refusal to call an election. Both sides recognize that this firmly established policy of the Board is susceptible to exceptions, among which is what is called a "schism" between two labor organizations or between factions of the same organization, which makes it doubtful or uncertain as to which should be recognized by the company as the properly constituted bargaining agent of of its employees. It is asserted that the Board refused to follow its own decisions in holding that a schism existed in the instant situation which justified it in ignoring its contract bar policy. The policy thus stated as well as the exceptions thereto are solely of the Board's creation and we see no reason why the Board cannot reasonably expand or restrict this policy as it sees fit. While we think there is merit in the company's contention that EIU was the sole organization which was or should have been recognized by the company, we are not persuaded that the Board's action on this score was not within its discretion. Moreover, the company's contract with EIU has expired or will shortly expire, and it would appear that the question is moot or soon will become so. N. L. R. B. v. Efco Mfg., Inc., 1 Cir., 203 F.2d 458, 459. See also N. L. R. B. v. Grace Co., 8 Cir., 184 F.2d 126, 129.

A more important reason, in our judgment, why an election should not have been called or, in any event, why the Board should have refused to certify the results of an election, stems from the fact that Local 1083, pretending to act as a successor to EIU, seized all the property, money, books and records of EIU and deprived its members of all access thereto or benefits therefrom. The Board, however, treats this matter with scant consideration and in its Decision and Direction of Election refers to it only in the following statement: "The E. I. U. further contends that it would be inequitable to hold an election while Local 1083 is still holding funds belonging to the E. I. U. As noted above, however, the question of the ownership of these funds is now pending before the courts. We are not convinced that an election should be delayed pending its determination."

The record furnishes little information as to the nature of the proceedings in the State court but it appears that EIU or some of its members instituted an action placing the ownership of the property in issue and that an injunction of some sort was entered, directed at Local 1083, regarding this property. With that litigation we need not be concerned, certainly we do not intend to prejudge it. We are, however, confronted with the question as to the effect which possession and control by Local 1083 was reasonably calculated to have upon employees participating in an election.

 We have already referred to the commissary conducted on the company property for many years by EIU. The profits from this business were used to provide sick and death benefits for members of EIU. This fund was held by the treasurer of EIU, and when he with other officers went over to Local 1083, this fund and, as shown, all other property, were taken along and custody transferred to the treasury of the latter organization. The treasurer of EIU was not, in our view, the custodian of this fund merely as an officer of that organization but he held it as a trustee solely for the benefit of the members of EIU.

Immediately, however, upon the transfer of this fund, Local 1083 refused to honor sick benefit claims from members of EIU unless and until they affiliated

with Local 1083. In a letter dated May 6, 1951, sent to all employees and signed by DeWitte as president of Local 1083, it was stated: "Only paid up members in Local 1083 are getting sick and death benefits, so be certain that you do not become delinquent. Members on Check-Off that have signed the pledge petition are considered in good standing, even though the Company is holding up your dues * * *. If you have not signed the petition get to your steward and sign it today." The letter further stated: "Those not on Check-off—get your old union membership card to your steward and have him exchange your old card for your new Local 1083 card, No Charge."

■ The fact that litigation was pending in the State court relative to these funds furnishes no reason why the Board should not have considered and determined what effect, if any, their possession, control and use by Local 1083 was reasonably calculated to have upon an election. Little wonder that Local 1083 attempts so desperately to establish the premise that it was not a new or different labor organization but merely a successor to EIU. In no other way, in our view, could it justify the taking over of these funds and serving notice on those for whose benefit they had been accumulated that they must sign membership cards in Local 1083 or else they would be deprived of the benefits for which the fund was intended. However, when the premise upon which this conduct is sought to be justified is rejected, as we have, the contention that the activities of Local 1083 relative thereto had no coercive effect is without substance. A more fruitful means of exerting pressure upon members of EIU to desert that organization and align themselves with Local 1083 can hardly be imagined. It was coercion, open, direct and no doubt effective. It was such that EIU had two strikes on it before the election was called.

■ Whether we view this situation as invalidating the Decision and Direction of Election or as impairing the result is of little consequence because either way it is viewed, the same result is reached. Obviously, the result cannot stand if the election was improperly called and neither can it stand if the election was conducted under circumstances which precluded a fair choice by the employees. It is possible that an election might have been properly directed and held if the Board had made provision prior to the election for the elimination of the basis upon which Local 1083 was enabled to exert pressure and coercion upon the employees. As shown, however, no attempt was made by the Board to do so; in fact, the advantage which Local 1083 had obtained by its questionable tactics was ignored. It appears that the Board overlooked the wholesome principle enunciated in its decision in The Matter of General Shoe Corporation, 77 N.L.R.B. 124, as follows (page 127): "In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees. It is our duty to establish those conditions; it is also our duty to determine whether they have been fulfilled."

Closely related to the matter lastly discussed is the company's assertion that Local 1083 made improper use of the Board's Decision and Direction of Election. On the evening before the election, Local 1083 published and distributed to the employees a newspaper containing an article entitled "Government Documents Prove E. I. U.-Company Collusion-Chicanery." On the front page appeared a letter signed by Elmer DeWitte, addressed to "Dear Fellow Workers," calling their attention to what was asserted to be the "Complete Text of the N. L. R. B. Decision which appears on page 2 of this 'Election Edition of 1083 news.'" The article then states: "Here are the words of a U. S. Government Agency that completely exposes all the lies and subterfuges released by those company minded persons who oppose your having a union free from company domination." The article, however, as

published was not as represented but omitted from the Board's decision the sole paragraph which referred to the withholding of funds by Local 1083 (heretofore quoted). The Board reasoned that this activity amounted to nothing more than "a charge of false campaign propaganda," and held "that this conduct did not warrant the setting aside of the election results." We are not in disagreement with the Board's reasoning, considering this incident alone and unrelated to what had previously transpired. Certainly, however, the use of the Board's decision in this manner was improper and when considered in connection with the situation previously discussed, we think it could well have affected the result of the election. It would seem certain that such was the purpose; otherwise, why was it not circulated until the evening before the election when there was no opportunity to reply? More important, if it was not intended to deceive the employees, why was the paragraph omitted from the document which was represented to be a complete text? In this connection, we find nothing in the record to indicate that the Board's decision had otherwise been given general circulation among the employees. The minimum weight which can be given to this incident is that it is a further indication of the intention of Local 1083 to win the election by means foul or fair.

■ Other incidents are called to our attention which the company asserts show a pattern or course of conduct on the part of Local 1083 to coerce and intimidate those who persisted in their affiliation with EIU or who refused to join Local 1083. In view of what we have said and the conclusion we have reached, we see no occasion to discuss the situation further. Our study of this record leaves us with the firm conviction that Local 1083 was conceived under a heavy cloud of suspicion and that its conduct was such as to preclude the inalienable right of the employees to select their bargaining representative in an election free from coercion and intimidation. In our judgment, the result of the

election should not have been acquiesced in by the Board, and it should have refused to certify Local 1083 as the bargaining representative. Such being our judgment, we refuse to enforce the order, as requested by the Board.

The order under review is dismissed.