**FOREMAN & CLARK, Inc.**
v.
**NATIONAL LABOR RELATIONS BOARD.**
No. 13894.

United States Court of Appeals,
Ninth Circuit.
July 30, 1954.

Sheppard, Mullin, Richter & Balthis, George R. Richter, Jr., Roy Littlejohn, Los Angeles, Cal., for petitioner.

George J. Bott, Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Fannie Boyls, Ruth V. Reel, Washington, D. C., for respondent.

Before HEALY, BONE and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

"The flattery of hope and the impressions of fear", referred to by common-law writers in connection with confessions,[1] can intrude themselves into labor relations as well.

■ The National Labor Relations Act, 29 U.S.C.A. § 151 et seq., hereinafter referred to as the Act, protects the employee from "unfair labor practices", as defined by statute. Such practices include, by necessary implication, any "threat of reprisal or force or promise of benefit." [2]

■ But the power of the National Labor Relations Board, hereinafter referred to as the Board, is not limited to protecting the employee from such "unfair labor practices". It may also prevent "discriminatory use of company facilities (interfering) with the employees' freedom of choice in the selection of a bargaining representative".

■ It is our task to determine whether, in the light of the entire record in the instant case, Foreman & Clark, Inc., referred to herein as the Company, has thus interfered with its "employees' freedom of choice". In such determination, we must be guided by two working principles: (a) "The Board's findings are entitled to respect", because of the

deference that should be paid to its "expertise"—a word of which Mr. Justice Frankfurter seems fond; [3] and (b) its findings "must nonetheless be set aside when the record before a Court of Appeals *clearly* precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both". (Emphasis supplied.)

■ In striking a rational balance between these two considerations, it will not do for courts to give lip-service to the "expertise" of an administrative agency, and then scrutinize with a captious eye and weigh with an apothecary's scale every finding made by such an agency. If there is on the record considered as a whole actually substantial evidence to support the findings, they should be upheld and the resulting order should be enforced.

1. *Statement Of The Case.*

Since the Company has raised a number of procedural objections, a somewhat full outline of the proceedings before the Board will be helpful.

In Case No. 21–RC–1836, hereinafter referred to as No. 1836, a petition was filed with the Board on March 6, 1951, by Local 297, Amalgamated Clothing Workers of America, CIO, hereinafter referred to as the Union, seeking certification as representative of employees performing alterations in six of the Company's nine retail clothing stores in Southern California. On March 22, 1951, the petition was amended to cover employees performing alteration work in all of the aforesaid nine retail stores. Two of the stores are situated at 707 South Hill Street and 5657 Wilshire Boulevard, Los Angeles, and the other seven establishments are in Hollywood, Pomona, Huntington Park,

1. Wigmore regards this phrase as a part of the "sentimental rhetoric * * * interpolated by editors into Gilbert's and Hawkins' treatises". See 3 Wigmore on Evidence, Third Edition, Sec. 818, Note 15, Page 237.

2. Cf. 29 U.S.C.A. § 158(c).

3. Universal Camera Corporation v. N. L. R. B., 1951, 340 U.S. 474, 488, 490, 71 S.Ct. 456, 95 L.Ed. 456; Far East Conference v. United States, 1952, 342 U.S. 570, 574–576, 72 S.Ct. 492, 96 L. Ed. 576.

Burbank, Long Beach, San Diego, and San Bernardino.

The "unit" for which a "certification of representatives" was sought "included: All Tailor Shop employees, including Tailors, Bushelmen, Finishers, Operators, Rippers and Pressers". It excluded "All others, including watchmen, guards, professional employees and supervisors as defined in the \* \* \* Act, as amended".

On May 28, 1951, a hearing was held at Los Angeles before a hearing officer of the Board. On August 31, 1951, the Board issued a "Decision and Order" dismissing the petition, one member dissenting. The decision recited that "the Employer agrees with the geographic scope of the proposed unit, (but) contends that an overall unit including salesmen and will-call boys, in addition to those employees sought by the Petitioner (the Union), is the only appropriate unit." The majority decision found "no persuasive reason why the alteration shop employees should constitute a separate appropriate unit on a craft, professional or departmental basis," and that "No question affecting commerce exists concerning the representation of employees of the Employer, within the meaning of Section 9(c) (1) and Sections 2(6) and (7) of the (National Labor Relations) Act," infra.

On November 7, 1951, the Union filed a "Motion for Reconsideration" of the Board's decision of August 31, 1951. The Company on November 23, 1951, filed a "Reply Brief" in opposition to the motion for reconsideration.

On January 16, 1952, the Board issued its "Supplemental Decision and Direction of Election" setting aside its original Decision and Order of August 31, 1951, and containing a "Direction of Election" "by secret ballot \* \* \* as early as possible, but not later than 30 days from the date of this Direction".

In this supplemental decision, the Board found that "The tailors, bushelmen-fitters, finishers, operators, rippers and pressers at the Employer's stores are all engaged in manual work, much of it highly skilled, which is easily differentiated from the duties of the selling personnel. Tailor shop employees are paid on a different basis than (sic) other employees and in one instance work at times when the remainder of the store is closed. They are separately located and in most instances the salesmen are under direction not to enter their work quarters".

The Board further found that the unit was not "inappropriate as a departmental grouping merely because a limited number of these employees do a small amount of work outside of the department". Finally, the Board found, *"On the entire record"* that "the alteration employees constitute a basically highly skilled, distinct, and homogeneous departmental group which, in the absence of any past or present representation on a broader basis, constitutes a unit appropriate for the purposes of collective bargaining". (Emphasis supplied.)

On February 4, 1952, the Company filed a Motion to Stay Direction of Election, to Vacate Supplemental Decision, for Reconsideration, etc. The motion alleged that the Board's Supplemental Decision and Direction of Election of January 16, 1952, was filed without holding an additional hearing, without hearing any new evidence, and with "no opportunity \* \* \* afforded to Foreman & Clark, Inc., to rebut by evidence the statements made in the motion for reconsideration". The Company's motion also complained that, "while for all steps in this proceeding up to and including the Decision and Order of \* \* \* August 31, 1951, the nature and requirements of the formal or informal procedures have been stated and published in the Federal Register by the Board, (f) or all subsequent steps in these proceedings, no statement of the nature or requirements of the formal or informal procedures available have been published by the Board in the Federal Register". The motion then quoted in part Section 3(a) of the Federal Administrative Procedure Act, 5 U.S.C.A. § 1002(a), providing that every agency shall publish in

the Federal Register "statements of the general course and method by which its functions are channeled and determined, *including the nature and requirements of* all *formal or informal procedures available"*, etc. (Emphasis supplied in the motion)

On March 11, 1952, the Board denied the Company's motion to stay, etc. The election was held on April 4, 1952, by the employees in the Company's men's and women's alteration departments at the nine stores mentioned above. The Union lost by a vote of 18 to 17.

Four days later, the Union filed a letter of "formal protest" regarding the election, alleging that "management's representatives assembled the employees on the premises of the Company, during the working hours of such employees, and there made statements against the Union, without the Union having the opportunity or the use of equal facilities to reply to management's distortions, half-truths, and falsehoods." The Board was requested to set aside the election.

On May 13, 1952, the Regional Director of the Board filed his report on the Union's objections. The report stated that the Company's president visited each of the nine affected stores and made an informal speech to the alteration department employees; that there was evidence that some of the employees knew a few days in advance that the president was going to visit them, but, the report added, the Union's representatives "deny that they knew of the speeches before the evening of April 3 (the day before the election)". Three of the speeches were made two days before the election, and six were made on the day before the election.

The report further recited that the eligible voters were called together in the alteration shop at each store to hear the president of the Company during working hours; that in general the employees had no alternative but to attend; that there was no evidence that the Company president made any statement to the employees which might be held to be coercive; that there was no showing that the Union requested the right to address the employees, or that any employees requested the privilege or attempted to rebut the president's statement; that no representative of the Union knew of these meetings until the last one had been held; that the timing of the president's speeches was such as to make impossible the holding of any further meetings for the purpose of giving the Union an opportunity to rebut his statements; that the Company in effect denied the Union such an opportunity, by timing the speeches as it did; and that by addressing the employees in small groups the Company may have interfered with the election.

The Regional Director closed his report by recommending that the Board set aside the election.

On May 22, 1952, the Company filed exceptions to the Regional Director's report, requesting that the Board overrule the recommendations of the Regional Director and certify the results of the election. Counsel point out that the exceptions "did not deny that non-coercive and non-promising speeches had been made", but objected "to the report and recommendation of the Regional Director to set aside the election on the ground that, being based solely on the mere timing of a non-coercive speech, it would directly contravene Section 8(c) of the Act (infra) and the guaranty of freedom of speech in the First Amendment to the Constitution of the United States."

The exceptions concluded with the statement that if the Board believed that non-coercive and non-promising speeches to employees could be made the basis for setting aside an election—

"We submit that, in that event, a hearing would be necessary to determine the facts with reference to the opportunities available to Petitioner (the Union), and availed of by it, to make known its views to the employees."

On October 21, 1952, the Board issued a Supplemental Decision, Order and Second Direction of Election, the Chairman

dissenting. The majority agreed with the Regional Director's conclusion that by timing the speech "the Employer made impossible the holding of any further meetings before the election and thereby, in effect, denied the Union an opportunity to speak under comparable circumstances". The Decision continued:

> "Taking into account the locations of the nine stores involved and the amount of time necessary to cover these distances, as evidenced by the time consumed by the Employer's own schedule in making his speeches, it is clear that the Employer by so timing his remarks precluded the possibility of the union being able to request and be given a similar opportunity to speak. By thus using the company time and property for electioneering speeches to employee assemblies while, in effect, denying the Union similar use, the Employer prevented the employees from hearing 'both sides of the story under circumstances which reasonably approximate equality.' This discriminatory use of company facilities interfered with the employees' freedom of choice in the selection of a bargaining representative."

The Board did point out, however, that there was no allegation "that the contents of the Employer's speeches went beyond the protection of 8(c) of the Act (29 U.S.C.A. Sec. 158, supra)".

A "Second Direction of Election" was promulgated by the Board at the same time that it set aside the election of April 4, 1952.

On November 3, 1952, the Company filed a motion to vacate the supplemental decision and requesting that the Board "direct a hearing for the obtaining of evidence in the proper and legal manner".

On November 21, 1952, the Board denied the Company's motion to vacate the Supplemental Decision of October 21, 1952.

On January 9, 1953, or within twelve months of the purported election of April 4, 1952, a second election was held among the employees in the same unit in which the first election was held. The vote was 26 to 8 in favor of the Union.

Based on the results of this second election, a "Certification of Representatives" was issued by the Board on January 19, 1953, declaring the Union to be the exclusive representative of the employees in the unit.

In Case No. 21–CA–1621, the General Counsel for the Board, by the Regional Director for the Twenty-First Region, issued a complaint against the company, alleging that the latter "had refused to bargain collectively" with the Union and was "thereby engaging in unfair labor practices," etc.

After certain proceedings that need not be detailed here, on June 3, 1953, the Board rendered its Decision and Order, affirming its rulings, orders, etc., holding that its Certification of Representatives was not invalid, ordering the Company to cease and desist from refusing to bargain collectively with the Union, etc.

The case comes to this Court on the Company's Petition for Review of the Board's Decision and Order of June 3, 1953.

2. *Some Additional Facts.*

Most of the material facts in this case are disclosed in the pleadings and proceedings that have just been fully summarized. For a proper understanding of the case, however, a few supplemental facts should be stated and some nomenclature clarified.

In the first place, it should be noted that counsel for the Company announced: "The company makes no contention that if a unit of tailor shop employees should be found appropriate (as a unit for collective bargaining), * * * the unit should not include all of the nine stores which are listed in the Petition, nor all of the employees who are shown on the company's job classifications as listed in Board's Exhibit No. 2." Exhibit No. 2 was prepared in the office of the Board's Hearing Officer from the payroll listing of March 17, 1951.

The Company's position, however, is that the tailor shop employees do not constitute an appropriate unit in themselves. With respect to the classifications listed, counsel stated at the trial that "the tailor shop foreman and shop foreman" would be included under the Act, provided, of course, that the unit itself is found to be appropriate. In other words, there are no supervisory positions within the meaning of the Act listed on the payroll exhibit.

It is chiefly in connection with these foreman positions that some clarification of terminology is necessary. In the record here, the highest employee in the tailor shop in each of the nine stores is variously designated or described as "tailor shop foreman", "shop foreman", "working foreman", "leader", "leadman", and "bushelman-fitter".

Despite all these elaborate or high-sounding titles, it is the store manager in each of nine stores who "has the authority within his store".

The Company's own confusion and vagueness as to titles and positions is indicated by the testimony of Jackson A. Wilcox, the operating manager of the corporation.

Mr. Wilcox, who was the Company's sole witness, testified at great length regarding the tailor-shop positions at the nine stores.

After declaring that the "tailor shop foreman" or "shop foreman" at the Hollywood store was "one of the two men listed as tailor", and that the foreman at Pomona "is the man listed as tailor", Mr. Wilcox announced that "The tailor is a position which we no longer have with the company".

A few moments later, however, Mr. Jackson revived tailorships—at least in the Hollywood and Pomona stores:

"Tailors, with the exception of the one at Hollywood and the one at Pomona, are really bushelman-fitters."

And still later:

"The ladies' tailor at Hollywood, that is misnomer again. That should be ladies' alterations."

Finally:

"Q. At Huntington Park we have a man listed as men's alterations, and you say he does the same work at that store that the bushelman-fitter would do at Seventh and Hill? A. No, that isn't quite correct. The bushelman-fitter at Huntington Park is the—

"Q. No. 1 man? A. Yes, the man listed has men's alterations at Huntington Park—Correction. That isn't a man at all. It is a woman, and should be listed as an operator."

As we have seen, counsel for the Company stated in open court that his client made "no contention that if a unit of tailor shop employees should be found appropriate * * * the unit should not include * * * all of the employees who are shown on the company's job classifications as listed on Board's Exhibit No. 2". Yet in its opening brief, the Company devotes many pages to developing in detail and with specific instances its objection that "Employees performing alteration work also perform the same functions as other employees in the store." For instance, the brief specifies that "Of the forty-five employees who spend all or a part of their time on alteration work, 8 spend portions (up to 50%) of their time in actual selling, 11 are bushelmen-fitters who work with the salespeople on the selling floor," etc., etc.

In view of the Company's avowal in open court that it found no fault with the job classification in Exhibit 2, its subsequent caviling over the types of employment covered by that exhibit seems somewhat inconsistent.

Be that as it may, regardless of the fact that some of the employees in the tailor shop group also do a certain amount of work in other departments, the unit as a whole is distinctive and homogeneous. Mr. Wilcox himself testified that "A bushelman is one who can perform any tailoring operation on a man's garment". "Most of them are required and equipped to make a coat from

start to finish". A fast learner "may become a good bushelman in three or four years' time". "Most of these men who qualify have been in the work most of their lives".

Then there are sewing machine operators, basters, finishers, seamstresses, the fitter at Burbank, pressers, etc.

Finally, the tailor-shop quarters are situated in a separate part of the store, generally adjacent to the will-call department, except in San Diego, where the tailor shop is in the penthouse on the roof. Occasionally the salesmen go into the tailor shop, but, according to Mr. Wilcox, "we try to keep them out of the tailor shop".

From the foregoing, it will be seen that the tailor-shop employees would bring problems to the bargaining table which would differ materially from the grievances of the other employees in the stores.

■ We are satisfied that there was substantial evidence to support the Board's unit determination.

3. *The Findings Of The Board, If Supported By Substantial Evidence, Are "Conclusive".*

The Company has specified ten errors, all assertedly arising from the Board's violation "of its own rules and regulations", a denial of due process of law, an "arbitrary, capricious * * * abuse of discretion" or violations of the Act or of the Federal Administrative Procedure Act. The specification of errors is summarized [4] and the applicable statutes are copied [5] in the margin.

4. 1. The Board's holding that the first election was invalid solely because of a non-coercive and non-promising speech by the employer to eligible employees.

2. The directing and holding of a second election in the same bargaining unit in which a valid election had been held in the preceding twelve-month period.

3. The issuance of the Supplemental Decision, etc., of October 21, 1952, without holding a hearing on issues of fact.

4. The denial of the Company's requests for a hearing on issues of fact necessary to the Board's determination "made before and after" the above-mentioned "Supplemental Decision was issued".

5. The setting aside of the Board's original order dismissing the representation proceedings and the issuance of the Supplemental Decision, etc., of January 16, 1952, where such action was based upon proceedings the nature and requirements of which were not published in the Federal Register in compliance with Section 3(a) of the Federal Administrative Procedure Act.

6. The basing of the Supplemental Decision and Direction of Election on facts not produced at the hearing and as to which no hearing had been held.

7. The denial of the Company's request for a hearing as to the facts on which the Board based its Supplemental Decision, etc., and as to which no hearing had been held.

8. The holding that a group of employees spending all or part of their time in performing alterations work constitutes an appropriate unit, where the Board admittedly considered the extent of organization as a factor, etc.

9. The finding that on or after January 19, 1953, the Union was the collective bargaining representative of the employees in the alleged appropriate unit, since the only evidence to support such finding was the election of January 9, 1953, which was invalid under Section 9(c)(3) of the Act.

10. The Board's holding that the Company was guilty of an unfair labor practice within the meaning of Section 8(a)(5) or 8(a)(1) of the Act by refusing to bargain with the Union certified by the Board in such unit upon the basis of such proceedings.

5. The Administrative Procedure Act:
5 U.S.C.A.:
"Sec. 1002. **Publication of information, rules, opinions, orders and public records**

"Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency—

"(a) Every agency shall separately Register * * * (2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; * * *. No person shall in any manner be required to

**404**

We have already adumbrated the limits of this Court's power of review with reference to an order of the Board. In view of the Company's vigorous attacks upon the order in the instant case, however, it might be helpful to pursue the inquiry further.

■ In the first place, the mandate of the statute itself is unequivocal and peremptory: The Board's findings of fact, if supported by substantial evidence, *shall* be conclusive.

Secondly, on innumerable occasions the Supreme Court has emphasized the great weight that the judiciary should accord to the findings of administrative bodies, including the Board.

In the oft-quoted case of United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, the Court adverted to "the statutory or constitutional limitations [on judicial review] of findings by administrative agencies or by a jury," citing with approval Corn Products Co. v. Federal Trade Commission, 1945, 324 U.S. 726, 739, 65 S.Ct. 961, 89 L.Ed. 1320, and National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 268, 58 S.Ct. 571, 82 L.Ed. 831.

After quoting at length from United States Navigation Co. v. Cunard Steamship Co., 1932, 284 U.S. 474, 485, 52 S. Ct. 247, 76 L.Ed. 408, the Supreme Court, in Far East Conference v. United States, 1952, 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576, continued:

"The Court thus applied a principle, *now firmly established,* that in

resort to organization or procedure not so published."

"Sec. 1009. **Judicial review of agency action**

\* \* \* \* \*

"(e) \* \* \* the reviewing court shall \* \* \* (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence \* \* \*. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

National Labor Relations Act:

29 U.S.C.A.:

"§ 158. **Unfair labor practices**

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title.

\* \* \* \* \*

"(c) The expressing of any views, argu-

ment, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

"§ 159. **Representatives and elections—Exclusive representatives; employees' adjustment of grievances directly with employer**

\* \* \* \* \*

"(b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: \* \* \*.

"(c) (3) No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. \* \* \*

"(c) (5) In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling."

"§ 160. **Prevention of unfair labor practices—Powers of Board generally**

\* \* \* \* \*

"(e) \* \* \* The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. \* \* \*"

cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the *limited functions of review by the judiciary* are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to *agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.*" (Emphasis supplied.)

Indeed, the Supreme Court has attributed to administrative boards powers that approach the psychic. We are told that such bodies are not limited to tangible evidence that "may be grasped thus". Compared to courts, they are "better equipped * * * for weighing intangibles * * *." Federal Communications Commission v. R.C.A. Communications, Inc., 1953, 346 U.S. 86, 96, 73 S. Ct. 998, 1005, 97 L.Ed. 1470. They may even rely upon *intuition*, provided it is "an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions,—*impressions which may lie beneath consciousness without losing their worth.*" (Emphasis supplied.) Chicago, B. & Q. R. Co. v. Babcock, 1907, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636, quoted in part and with approval in National Labor Relations Board v. Seven-Up Bottling Co. of Miami, Inc., 1953, 344 U.S. 344, 348,[6] 73 S.Ct. 287, 97 L.Ed. 377.

In the face of such massive authority, it is late in the day to scrutinize with a microscope the fact-findings of the Board. If, as here, they are supported by substantial evidence, they must stand.

4. *The Board's Determination Of The Appropriateness Of A Unit Will Not Be Set Aside Unless It Is "Arbitrary Or Capricious".*

■ Great latitude is given to the Board in determining "the unit appropriate for the purposes of collective bargaining".

In Packard Motor Car Company v. National Labor Relations Board, 1947, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040, the Court used the following language:

"The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion and the decision of the Board if not final, is rarely to be disturbed."[7]

---

**6.** See also National Labor Relations Board v. Waterman S.S. Corporation, 1940, 309 U.S. 206, 208–209, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; Phelps-Dodge Corporation v. National Labor Relations Board, 1941, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271; Federal Security Administrator v. Quaker Oats Co., 1943, 318 U.S. 218, 227–228, 63 S.Ct. 589, 87 L.Ed. 724; National Labor Relations Board v. Southern Bell Telephone & Telegraph Co., 1943, 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250; National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 130–131, 64 S.Ct. 851, 88

L.Ed. 1170; American Trucking Associations, Inc., v. United States, 1953, 344 U.S. 298, 310, 73 S.Ct. 307, 97 L.Ed. 337; National Labor Relations Board v. Lettie Lee, Inc., 9 Cir., 1944, 140 F.2d 243, 247; Local Union No. 12, Progressive Mine Workers of America v. National Labor Relations Board, 7 Cir., 1951, 189 F.2d 1, 4, certiorari denied, 1951, 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653.

**7.** See also Pittsburgh Plate Glass Co. v. National Labor Relations Board, 1941, 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251; National Labor Relations Board v. Hearst Publications, supra, 322 U.S. at page 134, 64 S.Ct. 851, 88 L.Ed. 1170; May Department Stores Co. v. National

Some courts have stated the rule to be that the Board's determination of the appropriate unit for collective bargaining will not be disturbed unless it is clearly "arbitrary", "capricious", or "unreasonable". National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 1943, 133 F.2d 876, 880, certiorari denied, 1943, 319 U.S. 751–752, 63 S.Ct. 1164, 87 L.Ed. 1705; National Labor Relations Board v. Continental Oil Co., 10 Cir., 1950, 179 F.2d 552, 554; National Labor Relations Board v. Grace Co., 8 Cir., 1950, 184 F.2d 126, 129.

5. *The Board's Determination Of The Unit Was Neither Arbitrary Nor Capricious.*

From our summary of the proceedings and the evidence, it will be seen that the tailor shop has been regarded by both employer and employees as an actual and not an artificial unit. As has already been pointed out, the Company, through its counsel, conceded to the Hearing Officer that if *any* tailor shop employees' unit was found to be appropriate, *all* the individual employees listed in the Union's proposed group should be included therein.

To borrow the language of the Court in National Labor Relations Board v. Armour & Co., 10 Cir., 1946, 154 F.2d 570, 573, 169 A.L.R. 421, certiorari denied, 1946, 329 U.S. 732, 67 S.Ct. 92, 91 L.Ed. 633, the tailor shop employees "are a cohesive group, allied as to their bargaining interests by the similarity of their functions and working conditions."

6. *The Board's Unit Determination Was Not Controlled By The Extent To Which The Employees Had Organized.*

Invoking Section 9(c) (5) of the Act, 29 U.S.C.A. § 159(c) (5), the Company specifies as error, *inter alia*, the fact that "the Board admittedly considered the extent of organization as a factor".

On its face, such a specified error does not disclose a valid cause of objection. The section in question proscribes only a unit determination in which "the extent to which the employees have organized" is *controlling*. The specified error fails so to state.

Quite aside from this technical defect, however, the record reveals that there is no merit to this objection. As has already been shown, the Board gave a number of specific and valid grounds for its determination that the proposed unit was appropriate, and made only passing mention of "the absence of any past or present representation on a broader basis". Indeed, the Board, in its Decision and Order of June 3, 1953—the ruling here attacked—specifically disclaims any such ground.

Even, however, if the extent to which the employees had organized had been a *contributing* reason for the Board's decision, the statute would not have been violated, so long as it was not the *controlling* one. National Labor Relations Board v. Salant & Salant, Inc., 6 Cir., 1948, 171 F.2d 292, 293; National Labor Relations Board v. Local 404, International Brotherhood of Teamsters, etc., 1 Cir., 1953, 205 F.2d 99, 103.

7. *An Employer Has Little If Any Voice Or Interest In The Selection Of His Employees' Bargaining Unit.*

One wonders precisely what interest this or any other employer actually has in the bargaining unit that is to represent his employees. His self-interest may cause him to object to unionism in general; but once that objection is proved to be futile, of what possible concern can it be to him whether Group A of his employees is represented by Local 1 or Local 100? Or, if an employer objects to unionization of any kind, why should he hold out for even a larger unit than

Labor Relations Board, 1945, 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145; National Labor Relations Board v. Lettie Lee, supra, 9 Cir., 140 F.2d at page 248; National Labor Relations Board v. Graham, 9 Cir., 1947, 159 F.2d 787, 788; National Labor Relations Board

v. National Plastic Products Co., 4 Cir., 1949, 175 F.2d 755, 758; Mueller Brass Co. v. National Labor Relations Board, 1950, 86 U.S.App.D.C. 153, 180 F.2d 402, 405; National Labor Relations Board v. Somerville Buick, Inc., 1 Cir., 1952, 194 F.2d 56, 59.

the one desired by his employees? Why should an employer, willing to accept a larger, comprehensive unit, haggle over the membership of a smaller one? What's Hecuba to him, or he to Hecuba?

The courts have repeatedly recognized the incongruity of such a position. In National Labor Relations Board v. National Mineral Co., 7 Cir., 1943, 134 F.2d 424, 426–427, certiorari denied, 1943, 320 U.S. 753, 64 S.Ct. 58, 88 L.Ed. 448, Judge (now Mr. Justice) Minton lucidly exposed the fallacy:

> "The employer's interest and his great concern about whom the employees shall have as their representative for bargaining purposes are easily demonstrated *as very unsubstantial.* Suppose the stockholders of the respondent company or any corporation were holding a stockholders' meeting for the purpose of electing the bargaining representative of the stockholders, namely, the directors; and suppose fraud, forgery and sharp dealing of many kinds were used in the procurement and handling of the stockholders' proxies in such an election. Would the employer be likely to tolerate the protest of its employees, who were not stockholders, that the election was crooked and invalid?" (Emphasis supplied.) [8]

 By a parity of reasoning, the same argument applies to an employer's interest in the selection of his employees' bargaining *unit.* This point was brought out in National Labor Relations Board v. S. H. Kress & Co., 6 Cir., 1952, 194 F.2d 444, 445, in the following language:

> "There was nothing arbitrary or unreasonable in this selection of the unit for collective bargaining purposes. N. L. R. B. v. Grace Co., 8 Cir., 184 F.2d 126, 129 [supra]. However, respondent [company] objected thereto and commenced and constantly kept up a series of objec-

tions and exceptions to almost every step taken by the Board in further proceedings. This is true, notwithstanding *nothing more was involved than collective bargaining procedure in which respondent had no voice."* (Emphasis supplied.)

**8. *There Is "Great Latitude" Accorded To The Board Both As To Remedies And As To Procedure—Including The Holding of Hearings—Relating To Elections And Other Matters.***

The Company complains of the Board's setting aside the first election, "restraint" of *the Company's* freedom of speech, "violation" of the Federal Administrative Procedure Act, denials of hearings, "violations" of the Board's own rules and regulations, etc. Certain of these objections, all of which relate to the Board's power to control election proceedings and other matters brought before it, will be discussed together, while others will be treated under separate headings.

The wide leeway that both Congress and the courts have accorded to the Board and to other administrative agencies has been given frequent judicial recognition.

The leading case of Inland Empire District Council, Lumber and Sawmill Workers Union v. Millis, 1945, 325 U.S. 697, 706–707, 65 S.Ct. 1316, 1321, 89 L.Ed. 1877, was decided before the amendment to 29 U.S.C.A. § 159(c), which now reads in part as follows:

> "* * * the Board shall *investigate* such petition [for collective bargaining representation] and if it has reasonable cause to believe that a question of representation affecting commerce exists *shall provide for an appropriate hearing upon due notice.* * * * If the Board finds upon the record of such hearing that such a question of representation exists, it *shall direct an election by secret ballot* and shall certify the results thereof."

**8.** See also National Labor Relations Board v. Kentucky Utilities Co., 6 Cir., 1950, 182 F.2d 810, 812–813.

■ We have italicized those portions of Sec. 159(c) (1) (B), as amended, that render pertinent to the case at bar the following observations of the Court in the Inland Empire Council opinion, supra:

"The section is short. Its terms are broad and general. Its only requirements concerning the hearing are three. It must be 'upon due notice,' it must be 'appropriate,' and it is mandatory 'in any such investigation,' * * *.

"Obviously great latitude concerning procedural details is contemplated. *Requirements of formality and rigidity are altogether lacking.* The notice must be 'due,' the hearing 'appropriate.' These requirements are related to the character of the proceeding of which the hearing is only a part. *That proceeding is not technical. It is an 'investigation,' essentially informal, not adversary.* The investigation is not required to take any particular form or confined to the hearing. The hearing is mandatory—'the Board *shall* provide for' it. But the requirement is only that it shall be provided 'in any such investigation.' *The statute does not purport to specify when or at what stage of the investigation the hearing shall be had.* * * * *"* (Emphasis supplied.)

■ There is specified as error that the Board was wrong in relying upon facts "not produced at the hearing and as to which no hearing had been held". A similar objection was thus answered in the Seven-Up Bottling Company case, supra, 344 U.S. at pages 348–349, 73 S. Ct. at page 290:

"It is urged, however, that no evidence in this record supports this back pay order; that the Board's formula and the reasons it assigned for adopting it do not rest on data which the Board has derived in the course of the proceedings before us. But in devising a remedy *the Board is not confined to the record of a particular proceeding.* 'Cumulative experience' begets understanding and insight by which judgments not objectively demonstrable are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, *differentiates perhaps more than anything else the administrative from the judicial process.* '(T)he relation of remedy to policy is peculiarly a matter for administrative competence. * * * *'* Phelps Dodge Corp. v. Labor Board, supra, 313 U.S. at page 194, 61 S.Ct. [845] at page 852. That competence could not be exercised if in fashioning remedies the administrative agency were restricted to considering only what was before it in a single proceeding." (Emphasis supplied.)

Furthermore, "The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective." Opp Cotton Mills v. Administrator of Wage and Hour Division of Dept. of Labor, 1941, 312 U.S. 126, 152–153, 61 S.Ct. 524, 536, 85 L.Ed. 624; Ewing v. Mytinger & Casselberry, Inc., 1950, 339 U.S. 594, 598, 70 S.Ct. 870, 94 L.Ed. 1088.

Finally, we need consider only briefly the Company's contention that "the Board's conclusion that the first election was invalid because of the non-coercive and non-promising speech made on behalf of Foreman & Clark", "was in violation of the guaranty of freedom of speech in the First Amendment."

As we have already seen, representation proceedings are "essentially informal, not adversary". Inland Empire Council v. Millis, supra, 325 U.S. at page 706, 65 S.Ct. at page 1321. They are "not even litigation, but investigation." National Labor Relations Board v. Botany Worsted Mills, supra, 133 F.2d at page 882.

█ There was no interference with the Company's freedom of speech in this proceeding.

9. *A particularly Free Hand Is Given To The Board In The Conduct Of Elections For Bargaining Representatives.*

█ The control of elections resides in the Board alone. National Labor Relations Board v. Waterman S. S. Corporation, supra, 309 U.S. at page 226, 60 S.Ct. 493.

In National Labor Relations Board v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, 86, affirmed, 1953, 346 U.S. 482, 74 S.Ct. 214, in which the Board *set aside* an election, this Court said:

> "The processing of a representation petition, however, is a matter in which the decisions to be made relate to policies which Congress has in general committed to the discretion of the Board."

█ After adverting to the fact that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees", the Supreme Court, in National Labor Relations Board v. A. J. Tower Co., 1946, 329 U.S. 324, 330–331, 67 S.Ct. 324, 328, 91 L.Ed. 322, noted an important qualification and an equally important counter-qualification to the rule:

> "In carrying out this task, of course, the Board must act so as to give effect to the principle of majority rule set forth in § 9(a), a rule that 'is sanctioned by our governmental practices, by business procedure, and by the whole philosophy of democratic institutions.' * * *

> "The principle of majority rule, however, does not foreclose practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud. Indeed, unless such adjustments are made, the democratic process may be perverted and the election may fail to reflect the will of the majority of the electorate." (Emphasis supplied.) [9]

10. *"The Board Is Not The Slave Of Its Rules".*

The Company complains that the Board's position is as follows:

> "That although its decision to set aside the first election was made solely on the theory of its own 'Bonwit Teller' doctrine, *which has since been repudiated by the Board itself*, its decision to set aside the first election should be sustained under its new 'Peerless Plywood' doctrine despite the fact that there are no facts in the record before this Court sufficient to warrant any finding based upon the Peerless Plywood doctrine," etc.

We will not attempt to analyze the Company's reasoning on this subject, since we regard it completely irrelevant to the problem now before us.

We are not here concerned with the "Bonwit Teller" doctrine, or the "Peerless Plywood" doctrine, or the "Livingston Shirt Corp." doctrine, which is a third rule of the Board discussed in the briefs.

The question with which we *are* here concerned is this, and only this: Is the Board's Decision and Order of June 3, 1953, to be enforced, in the light of the applicable statutes and *judicial* decisions thereunder?

The Board need not be haunted by that "foolish consistency" which "is the hobgoblin of little minds".

In Securities & Exchange Commission v. Chenery Corporation, 1947, 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580, 91 L.

---

**9.** See also National Labor Relations Board v. National Plastic Products Co., supra, 175 F.2d at page 758; National Labor Relations Board v. S. H. Kress & Co., supra, 194 F.2d at page 446; National Labor Relations Board v. Huntsville Mfg. Co., 5 Cir., 1953, 203 F.2d 430, 434; Kearney & Trecker Corp. v. National Labor Relations Board, 7 Cir., 1954, 210 F.2d 852, 858; National Labor Relations Board v. National Container Corp., 2 Cir., 1954, 211 F.2d 525, 532.

Ed. 1995, the Court thus discussed the question:

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a *case-to-case basis* if the administrative process is to be effective. There is thus a very definite place *for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual,* ad hoc *litigation is one that lies primarily in the informed discretion of the administrative agency.* [Case cited.]" (Emphasis supplied.)

▮ As was succinctly stated by Judge Medina in National Labor Relations Board v. National Container Corporation, supra, 211 F.2d at page 534:

"The Board is not the slave of its rules." [10]

11. *The Board's Right To Reconsider Its Original Decision Of January 16, 1952, Did Not Depend Upon Any Provision In Its Rules and Regulations.*

▮ The Company objects that the Board's Supplemental Decision and Direction of Election on January 16, 1952, "was contrary to Section 3(a) of the Federal Administrative Procedure Act", supra, in that "no statements of the nature or requirements of the formal or informal procedures available have been published by the Board in the Federal Register". In other words, the complaint is that "the Board's order of January 16, 1952, (was) founded upon proceedings taken without compliance with the applicable provisions of the Federal Administrative Procedure Act".

There is no merit to this contention. The clear purpose of Section 3(a), supra, is to provide a *shield* for a petitioner before the Board, or other agency, to protect him from being penalized for failing to resort to unpublished methods of procedure. It is not a *sword* by which a petitioner can strike down the agency's order, on the ground that the agency *has not authorized itself* to issue that type of order, by publishing a statement in the Federal Register!

*Conclusion*

As we have already pointed out, the Board does not claim "that the contents of the Employer's speeches went beyond the protection of Section 8(c) of the Act, (29 U.S.C.A. Sec. 158(c)) which refers to permissible expressions of views.

▮ Under the facts of this case, however, viewed in the light of the decisions applicable thereto, we agree with the Board's determination that the tailor-shop employees constitute an appropriate bargaining unit, and with its decision to set aside the first election because of the Company's last minute campaign speeches during working hours, under the circumstances already detailed. The latter decision was a proper exercise of the Board's "wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." National Labor Relations Board v. A. J. Tower Co., supra, 329 U.S. at page 330, 67 S.Ct. at page 328.

After a careful study of the evidence in the instant case, we are convinced that there is ample substantial evidentiary support on the record considered as a whole for the Decision and Order of June 3, 1953.

Accordingly, the petition for review and to set aside the decision and order of

---

10. See also National Labor Relations Board v. Guy F. Atkinson Co., 9 Cir., 1952, 195 F.2d 141, 148–149; Kearney & Trecker Corp. v. National Labor Relations Board, supra, 210 F.2d 852, 857.

the Board of June 3, 1953, is hereby denied, and the prayer of the Board for a judgment enforcing in whole the said order of the Board is hereby granted.