OVERNITE TRANSPORTATION COM-
PANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Jack EUDY et al., as Intervenors,
Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 8972, 9000.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 26, 1963.

Decided Dec. 27, 1963.

Robert J. Sanders (Sanders & Walker, Charlotte, N. C., on brief), for petitioners, Jack Eudy and others.

Warren M. Davison, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lee M. Modjeska, Atty., N. L. R. B., on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge.

In this appeal, the Company and a group of employees as intervenors seek review of a Board order requiring the Company to bargain collectively with the union. In its answer, the Board requests enforcement in full.

The Company is a common carrier of general commodity freight in interstate commerce, serving territories in Virginia, North Carolina, South Carolina, and Georgia. The Charlotte terminal contains a shop that handles all maintenance for the Company's rolling equipment. Shop operations are performed in two buildings located a hundred feet apart and designated as the "old shop" building and the "new" or "main shop" building. The old building is used primarily as a tire department where tire department employees perform such operations as wheel balancing and aligning, tire changing, greasing, oiling, and washing. The old building also contains a check bay where rolling equipment is inspected for safe highway operation and necessary minor mechanical repairs are made. Some body work and painting are also done in the old building. The greater portion of mechanical work, ranging from simple mechanical operations to major overhauls and rebuilding diesel engines, is performed in the new building. The parts department is also located in the new building. Parts department clerks distribute parts to the mechanics, but perform no mechanical duties.

J. W. Alexander, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for petitioner Overnite Transp. Co.

All shop employees are classified by the Company as mechanics, mechanic helpers, and mechanic trainees, parts department clerks, and tire department employees. The entire shop operation is under the supervision of Joseph T. Howell, Superintendent of Maintenance, and Shop Supervisor J. B. Whitley. There is no history of collective bargaining for any of the above employees. Although disputed, the record reveals that there is virtually no interchange of work between the employees performing mechanical duties and those employed in tire and parts departments.[1]

The Company has no formal apprenticeship program under the auspices of the Department of Labor, but it does have a "training program" under which employees with less mechanical experience receive on the job training to enable them to become "good mechanics." Further, most of these less experienced employees have attended diesel school at their own expense prior to employment by the Company. Upon cross examination, a Company witness testified that it takes a minimum of 4 years to become an all around first class mechanic.

Employees working under the Company training program are designated variously as mechanic helpers or mechanic trainees, with no apparent significance in the different classifications.[2] There is not a 3 step progression from trainee to helper to mechanic; both helpers and trainees are in a direct line of progression to mechanic. Helpers and trainees are classified as helpers on the shop payroll. The only logical conclusion to be drawn from the record is that the Company makes no distinction in the duties and status of helpers and trainees.

For this reason, these employees will be referred to as helper-trainees throughout the remainder of this opinion. The record also reveals that all mechanics and helper-trainees, including those employed in the check bay in the old building, are required to purchase their own tools and tool boxes, at costs ranging from a minimum of $200–$300 to a maximum of $700–$800.

Upon these facts established at the representation hearing, the Regional Director issued a Direction of Election, ruling that "all mechanics, mechanic helpers and mechanic trainees at the Employer's Charlotte, North Carolina, shop, excluding office clerical employees, all other employees, guards and supervisors" constituted an appropriate craft unit for purposes of collective bargaining and would be eligible to vote in an election to be held on May 18, 1962.

The ensuing election, conducted among the Company's employees, in the unit found appropriate, resulted in 18 ballots having been cast for the union, 10 against, and 9 challenged. After an investigation of the challenged ballots the Regional Director issued a Supplemental Decision and Certification of Representatives on June 20, sustaining 8 of the 9[3] challenges, and determined that the union had received a majority of the valid ballots cast, 18–10. The union was thereupon certified as the exclusive bargaining representative for the employees in the appropriate unit. Subsequently on June 27, the Company filed a Request for Review of the Supplemental Decision and Certification, which was denied by the Board on July 17. The Company's refusal to bargain constitutes the alleged violation of Sections 8(a) (5)

1. Company witnesses contended that mechanics, helpers, and trainees often performed non mechanical duties. Howell, Superintendent of Maintenance, however, testified that he could recall no instance within the 3 months preceding the representation hearing where a mechanic was assigned to do tire department work, nor any instance within the preceding 3–6 months where a helper or trainee was so assigned.

2. See n. 5, *infra*.

3. The union challenged the ballots of 2 lead mechanics and the 6 employees working in check bay. The Board agent challenged the ballot of one Keaton, whose status is unclear, on the ground that his name did not appear on the eligibility list. All challenges, except that as to one lead mechanic, were sustained by the Regional Director.

and (1). 29 U.S.C. § 158(a) (1) and (5) which is the subject matter of this controversy.

 The Company concedes the unfair labor practice, but citing American Federation of Labor v. N. L. R. B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940) contends that it is not chargeable with the refusal to bargain because of the Board's erroneous determination of the appropriate bargaining unit. The Company maintains that the Board in excluding all shop employees except mechanics and helper-trainees from the bargaining unit acted in an arbitrary and capricious manner. It also maintains that the Board permitted the extent of organization to control its unit determination in violation of the express prohibition contained in 29 U.S.C. § 159(c) (5). The Company finds definitive proof of the Board's bad faith in its affirmance of 7 out of the 8 union challenges, i. e., the 6 helper-trainees and a lead mechanic. We are convinced from our reading of the record as a whole that the Board was neither capricious and arbitrary, nor was it acting in violation of its statutory duty in its determination of a proper bargaining unit. The Company may be quite correct in contending that a larger unit of all of its non-supervisory shop employees would have been proper; this does not invalidate the Board's finding of the smaller craft unit. As we had occasion to state only last term in General Instrument Corp. v. N. L. R. B., 319 F.2d 420 (4 Cir. 1963): "However, where, as often occurs, more than one unit might properly be found appropriate, the Board has the responsibility of making the determination. See N. L. R. B. v. Quaker City Life Insurance Co., 319 F.2d 690 (4 Cir. 1963), supra".

In a series of decisions prior to 1958, the Board did not recognize the craft status of automotive mechanics, the group with which we are here concerned. See, e. g., Gulf Oil Corp., 33 L.R.R.M. 1496 (1954), C. K. Williams & Co., 32 L.R.R.M. 1433 (1953), and Gulf Oil Corp., 22 L.R.R.M. 1502 (1948). Beginning in 1958, however, in International Harvester Co., 41 L.R.R.M. 1375 (1958), the Board recognized that the repair and maintenance of the modern automobile engine require the requisite skill and know how of properly trained craftsmen. A subsequent Board decision made it clear that an extensive apprenticeship program similar to that of International Harvester is not a prerequisite to the finding of an appropriate craft unit composed of automotive mechanics. The Board in Diamond T. Utah, Inc., 44 L.R.R.M. 1563 (1959), held that mechanics and their helpers constituted a permissible bargaining unit. This was true, the Board stated, because these men exercised the necessary skills and independent judgment identified with true craftsmen. The Board was not dissuaded from this view because there was no formal training program established by the Company. The Board noted the Company policy of hiring men with previous mechanical experience; assigning those with less experience to work as helpers, thereby furnishing them with on the job training. As in all crafts, there was necessarily some variation in the work the mechanics and helpers could and did perform.

 We think Diamond Utah dispositive of the case before us. We are impressed with the fact that all of the mechanics and helper-trainees are required, at considerable expense, to purchase their own tools and tool boxes. In addition Company officials admitted that most of the helper-trainees attended diesel school before being employed by the Company. Once employed, they receive instruction and supervision in their mechanical duties. This Company training program, though not formalized, has the purpose of training inexperienced employees to become mechanics. Upon completion of training, the employee would be reclassified by the Company as a mechanic [4], with the attendant pay and

4. The record reveals that the Company hired some of the helper-trainees as early as a year or 14 months prior to the representation hearing. At the time of the

responsibilities. These mechanics and helper-trainees perform only mechanical duties except in rare circumstances. The record fails to divulge just how often these men are called upon to perform non-mechanical duties, but it clearly shows that there is not a constant interchange of work among tire department and parts department personnel on the one hand and mechanics and helper-trainees on the other. Mechanical duties, as is true in any craft, vary in the degree of skill required for their performance. Some helper-trainees may never reach the status of first class mechanics. This, however, doesn't detract from the Company policy and purpose of giving its less experienced personnel the opportunity to advance. Thus we find substantial evidence in the record to support the Board's determination.

■ The Company also attacks the Board's decision on the grounds that it gives controlling weight to the extent of organization in determining the appropriate bargaining unit. We, in unison with other Circuits, have held that the extent of union organization may be one factor considered by the Board in determining an appropriate unit so long as it is not the controlling factor. N. L. R. B. v. Quaker City Life Ins. Co., 319 F.2d 690 (4 Cir. 1963). See also Union Carbide & Carbon Corp. v. N. L. R. B., 244 F.2d 672 (6 Cir. 1957); Westinghouse Elec. Corp. v. N. L. R. B., 236 F.2d 939 (3 Cir. 1956); Foreman & Clark, Inc. v. N. L. R. B., 215 F.2d 396 (9 Cir. 1954), cert. denied, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954); N. L. R. B. v. Smythe, 212 F.2d 664 (5 Cir. 1954); cf. N. L. R. B. v. Morganton Full Fashioned Hosiery Co., 241 F.2d 913 (4 Cir. 1957). The relevancy of N. L. R. B. v. Glen Raven Knitting Mills, Inc., 235 F.2d 413 (4 Cir. 1956), heavily relied on by the Company, is restricted to those cases where the extent of union organization is "found to have been the only factor

relied on by the Board in deciding the appropriate unit." General Instrument Corp. v. N. L. R. B., 319 F.2d 420 (4 Cir. 1963).

In the present controversy, giving the Company's contentions benefit of all reasonable doubts, we nonetheless conclude that the Board, at the very most, may have used the extent of organization as one criterion in determining the appropriate unit. Evidence presented at the representation hearing related to the status and functions of the mechanics and helper-trainees. The Company did not proffer any evidence relating to the extent of union organization. It was not until the unfair labor practice proceeding that the Company attempted to introduce evidence that the union had initially attempted to solicit all "garage" employees. This evidence, offered as newly discovered, was admitted by the Company to have been "for the most part" available at the representation hearing and was properly rejected by the Board.

The Company reasons that because the union's motive in petitioning for a craft unit was based upon the extent to which it had successfully organized the employees therein, it necessarily follows that the Board was similarly motivated. We think this a *non sequitur*. The union in all probability sought certification of the largest possible pro-union bargaining unit. But to ascribe the same motivation to the Board would require us to find that the Board ignored all relevant evidence adduced at the representative hearing and, disregarding the efficacy of such evidence, based its unit determination solely on the extent of union organization. We find no justification to hold that the Board acted with such duplicity.

We finally consider the Board's action in discounting the votes of 6 employees, described variously as mechanic helpers and mechanic trainees[5], who were em-

representation hearing, none of these men had been reclassified as mechanics. For this reason there are no case histories of men who went through the Company train-

ing program and were ultimately advanced to the position of mechanic.

5. The voting list, containing names of those employees eligible to vote in the represen-

ployed in the check bay in the old shop building.

The union challenged the votes of these 6 employees, and the challenges were upheld on appeal. The Board stated in its Supplemental Decision and Certification of Representatives:

"[These men] are service employees who work in the check bay, and the grease pit, located in a building separate from the mechanical shop. They perform such work as *washing and greasing tractors and trailers, changing tires and wheels,* checking lights, brakes, windshield wipers, and batteries." (Emphasis added.)

■ The record does not bear out this statement. The record, on the contrary, reveals that these men, who are regularly assigned to the check bay, perform only inspection duties and minor mechanical repairs. Consequently, we reverse the Board as to the status of these 6 men and hold that they should be included in the bargaining unit.

The union also challenged the ballots of two lead mechanics, alleged to be supervisors for purposes of the Act. At the representation hearing their status was litigated and one found to be a non-supervisory lead man eligible to vote and the other an ineligible supervisor. In the supplemental decision this determination was upheld. We find that the record bears out the Board in affirming.

■ The Company urges that the election be set aside. It argues that the erroneous Board exclusion of these 6 employees working in the check bay was compelling proof of the Board's arbitrary and capricious unit determination in direct violation of Sec. 9(c) (5). The key factor in setting aside an election, whether by virtue of the conduct of the parties or of the Board, is the failure of those in the bargaining unit to make their collective desire effective. This determining factor is lacking in the present controversy. We are unable to see how the ex-

clusion of these 6 votes affected the free choice of the parties concerned. The ballots of these 6 were challenged when they presented themselves to vote, and could in no way have influenced the votes of the remainder. The remaining employees proceeded to cast their ballots and determined to be represented by the union. Even assuming that the hearing examiner acted, as the Company contends, not out of honest error, but out of a desire to insure union victory, his conduct could have no bearing on the ultimate outcome.

■ In N. L. R. B. v. National Plastic Products Co., 175 F.d 755 (4 Cir. 1949), we refused to set aside an election in which 17 employees had been erroneously allowed to vote. The employer contended that these 17 employees were slated for discharge because of the completion of the project in which they were engaged. With their ballots excluded, the union won the election by a majority of 1. On these facts, Chief Judge Parker, writing for a unanimous court, held that there was "certainly no basis for overturning the finding of the Board that the union represented a majority of the company's employees". 175 F.2d at 758. We consider that case controlling here. Assuming that all 6 check bay employees and the non-supervisory lead mechanic voted against the union, and adding their ballots to those counted against the union, the union still prevails by a vote of 18 to 17. In view of this, we are unwilling to set aside the election. *Cf.* N. L. R. B. v. Wilkening Mfg. Co., 207 F.2d 98 (3 Cir. 1953).

In conclusion, we are convinced from the record as a whole that the union successfully sustained the burden of proof placed on it to establish the appropriate bargaining unit. In the nonadversary representation hearing, the union, primarily through cross examination of Company personnel, adduced the necessary facts to justify the Board's determination of the appropriate craft unit.

tation election referred to those men as mechanic trainees. Throughout the representation hearing, however, they were referred to as mechanic helpers. As stated, we think the different reference immaterial.

United States Smelting, Refining & Mining Co., 38 L.R.R.M. 1314 (1956). Finding this to be so, we grant enforcement of the Board's order with the appropriate proceedings not inconsistent with the views expressed herein.

Reversed in part.