**SINGER SEWING MACHINE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 8917.**

United States Court of Appeals Fourth Circuit.

Argued June 14, 1963.

Decided Feb. 17, 1964.

Edward W. Scully, New York City (Winthrop, Stimson, Putnam & Roberts, New York City, W. Francis Marion, and Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., and Neil F. Twomey, New York City, on brief), for petitioner.

Lee M. Modjeska, Attorney, N. L. R. B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Warren M. Davison, Attorney, N. L. R. B., on brief), for respondent.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and WINTER, District Judge.

WINTER, District Judge.

Petitioner, Singer Sewing Machine Company (hereafter "Singer"), seeks, pursuant to § 10(f) of the National Labor Relations Act, 29 U.S.C.A. § 160(f), to set aside an order of the National Labor Relations Board (hereafter "Board"), that Singer cease and desist from refusing to bargain collectively with Retail, Wholesale and Department Store Union, Local 101, AFL-CIO (hereafter "Union"), as the exclusive representative of employees of Singer's Pittsburgh City District retail shops, and that Singer take certain affirmative remedial steps related thereto. The Board, pursuant to § 10(e) of the Act, 29 U.S.C.A. § 160(e), prays that its order be enforced in full.

The order to be reviewed, officially reported in 140 N.L.R.B., No. 97, is the outgrowth of a representation proceeding wherein the Board determined the appropriate bargaining unit, conducted an election, and certified the Union as the exclusive representative for certain employees. The representation proceeding is not officially reported. Singer refused to bargain so as to be in a position to challenge the validity of the certification, and this refusal served as a basis for a finding that Singer had engaged in an unfair labor practice and resulted in the cease and desist order referred to above. By § 9(d) of the Act, 29 U.S.C.A. § 159(d), the representation proceeding is subject to judicial review as a part of the review afforded an order based upon the finding of an unfair labor practice.

Singer attacks the finding that it engaged in an unfair labor practice by asserting the invalidity of the bargaining unit fixed by the Board. The Board fixed as a unit the employees in the stores comprising Singer's Pittsburgh City District. Singer contends that the record, in its present state, demonstrates that the only appropriate bargaining unit is the employees of its retail stores in the Pittsburgh Agency.[1] Additionally, Singer

1. Initially, in the proceedings before the Board, a subsidiary question was present

as to the classes of employees to be included in whatever was determined to be

contends that during the unfair labor practice hearing it was improperly prevented from producing evidence to show that the controlling factor in the determination of the Pittsburgh City District as the appropriate bargaining unit was the extent to which the employees had organized, in violation of § 9(c) (5) of the Act, 29 U.S.C.A. § 159(c) (5).

We determine, first, whether the record, excluding any consideration of the evidence proffered by Singer to support its second contention, would support the determination that the Pittsburgh City District is an appropriate bargaining unit. Our function is not, as Singer apparently suggests, to determine what other units could be considered as appropriate ones, or what unit we in the first instance, would fix were the decision to be ours. Our function is to determine whether there has been a misapplication of law, lack of substantial evidence, or abuse of discretion in the determination made by the Board. If none of the latter are found, the Board's determination must stand, for it is the Board which has the discretion and the responsibility for deciding whether a unit is appropriate for purposes of collective bargaining; and its determination, if supported by substantial evidence and within the bounds of law, is binding on us, General Instrument Corporation v. N. L. R. B., 319 F.2d 420 (4 Cir. 1963); N. L. R. B. v. Quaker City Life Insurance Company, 319 F.2d 690 (4 Cir. 1963).

The Board, in concluding that the Pittsburgh City District was an appropriate bargaining unit, adopted the recommended finding of the Regional Director, viz.,

"Upon the record as a whole, including the geographical separation of the stores in the Agency, the existence of a degree of District autonomy in the matters of hiring and discharge, the administrative organization of the Employer, and the lack of any collective bargaining history

* * * the employees in the Pittsburgh City District, which comprises an administrative subdivision of the Employer, as well as a supervisory area, constitutes an appropriate unit. * * *"

These findings are supported by substantial evidence and, in the absence of other infirmities in the proceedings, are, we believe, legally sufficient to support the Board's legal conclusion. A brief resume of the principal evidence so establishes:

Singer, initially a manufacturer of sewing machines is now engaged also in the selling and servicing of sewing machines, appliances and notions at retail throughout the United States through thirty-two administrative divisions called General Agencies. Each agency operates retail stores within the territory assigned it. The Pittsburgh Agency, which Singer contends is the appropriate bargaining unit, has its central office in Pittsburgh, Pennsylvania, and operates forty-two retail shops within the Pittsburgh Agency. The Pittsburgh Agency comprises a territory extending approximately two hundred sixty miles from north to south, and ninety-five miles from east to west. The northernmost store (Erie, Pennsylvania) is about one hundred forty miles from Pittsburgh, the southernmost store (Clarksburg, West Virginia) is about one hundred twenty miles from Pittsburgh, the westernmost store (Steubenville, Ohio) is about forty-five miles from Pittsburgh, and the easternmost store (Johnstown, Pennsylvania) is about fifty miles from Pittsburgh. A General Agent directs the operation of the Pittsburgh Agency from the central executive offices in Pittsburgh. The Pittsburgh Agency is subdivided, for administrative purposes, into two divisions—the Northern Division and the Southern Division. Each division is in the charge of a Sales Supervisor, who operates out of the central office. Each division is, in turn, divided, again for administrative purposes, into three districts, each of which is supervised by a District Manager, who

the appropriate bargaining unit. Singer's contentions in this regard were decided

against it, and they are not advanced in this Court.

is responsible to the Sales Supervisor and to the General Agent.

The Pittsburgh City District, the unit found to be appropriate by the Board, consists of eight retail stores, six of which are within the City of Pittsburgh and two in suburban communities immediately adjacent thereto. It is part of the Southern Division of the Pittsburgh Agency. Until the commencement of these proceedings there has been no history of collective bargaining for any of the employees of the Pittsburgh City District or the Pittsburgh Agency.

Throughout the Pittsburgh Agency pay rates and commissions are uniform, excepting that starting rates for female employees vary according to the size of the community involved. Total hours of work are uniform throughout the Agency, the actual closing time of the stores varies according to local conditions. Vacations, holidays, pensions, and employee benefits are also uniform throughout the Agency.

The General Agent in charge of the Pittsburgh Agency makes up the annual budget plan, based upon the expected quota of sales, expenses, and authorized number of employees for each shop in the Agency. Sales promotion campaigns are conducted on an agency-wide basis. The General Agent can, and does, shift stores from one district to another according to the dictates of administrative convenience and necessity. All records—personnel, sales, inventory, reports of district managers, collection, employment—are maintained at the office of the General Agent. Payrolls for each store, however, are made up at a central office which services other agencies, as well as the Pittsburgh Agency. The bulk of the merchandise used in the Pittsburgh Agency is received from a warehouse located outside of the territorial confines of the Agency, and this warehouse services several agencies.

The District Manager has the responsibility of insuring that the policies, rules and regulations of the Agency are carried out in the stores in the district of which he is manager. In the performance of this function, the District Manager visits the stores, holds sales meetings, checks the store records, interviews job applicants, instructs and trains the store manager and store employees, makes necessary changes in the appearance of the store displays and, in general, supervises the operations of the individual stores in his district. While applications for employment are screened in the central office of the Agency, particularly for bonding purposes, the District Manager, or Sales Supervisor, makes the final disposition with respect to the hiring of employees. The District Manager may discharge or authorize the discharge of, employees for dishonesty. The District Manager may also make recommendations to the General Agent in regard to pay increases, transfers and promotions, but it is the latter who makes such decisions after consideration of the recommendation. The District Manager makes weekly written reports to the General Agent.

Thus, clearly there is a common interest or purpose among the employees of the Pittsburgh City District. The unit selected by the Board is one created by Singer in the first instance for its own purposes, and it is governed in part by a District Manager who has some degree of autonomy.[2] From the manner in which Singer has organized and operates its retail sales program, it may be fairly said that there is no sole bargaining unit which is the only correct unit. We cannot say that faced with a choice, the Board, on the record as a whole, has

---

2. Although on a local level, the autonomy of the District Manager in the instant case is like that of the District Manager in N. L. R. B. v. Quaker City Life Insurance Company, supra, where the unit found and upheld was coterminous with the scope of his geographical authority.

See also, National Labor Rel. Bd. v. Morganton Full Fash. Hos. Co., 241 F. 2d 913 (4 Cir. 1957); National Labor Rel. Bd. v. Glen Raven Knitting Mills, 235 F.2d 413 (4 Cir. 1956).

abused its discretion in selecting the Pittsburgh City District, N. L. R. B. v. Quaker City Life Insurance Company, supra; N. L. R. B. v. Pittsburgh Plate Glass Co., 270 F.2d 167 (4 Cir. 1959); cert. den. 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363 (1960); National Labor Rel. Bd. v. Morganton Full Fash. Hos. Co., 241 F.2d 913 (4 Cir. 1957); National Labor Rel. Bd. v. Glen Raven Knitting Mills, 235 F.2d 413 (4 Cir. 1956); see also, General Instrument Corporation v. N. L. R. B., supra.

But, aside from the apparent legality of the result, Singer attacks the manner in which the Pittsburgh City District was selected as the appropriate bargaining unit, and complains of the denial to it of the right to present evidence showing the activities of Board and Union personnel in the time interval between the hearing in the certification proceeding and the trial examiner's intermediate report and recommended order. As previously stated, the evidence was sought to be adduced in support of Singer's contention that, illegally, the controlling factor in the selection of the Pittsburgh City District was the extent to which the employees had organized.

The starting point in our consideration is a recitation of the evidence which was proffered and refused, the denial of the right to interrogate the field examiner for the Board, and also the other circumstances established by the record which lend significance to such evidence. The bargaining unit hearing was held June 27, 1961, and the decision of the Regional Director for the Sixth Region, determining the Pittsburgh City District as the unit appropriate for the purposes of collective bargaining, was issued on August 25, 1961.

At the unfair labor proceeding, Singer proffered to prove that a certain Mr. John Connerton, a field examiner and subordinate of the Regional Director, on or about July, 25, 1961, wrote a letter and telephoned Singer's Pittsburgh General Agent, Mr. Arthur J. Koller, requesting the latter to supply a list of employees for Singer retail stores located in Mt.

Lebanon, Carnegie and McKeesport, Pennsylvania, for the asserted purpose of checking a "showing of interest submitted" by the Union. These three shops are located in Allegheny County, Pennsylvania, but are not part of the Pittsburgh City District. The eight shops comprising the Pittsburgh City District are also all located in Allegheny County. Because the Union petitioned only for the shops in the Pittsburgh City District to be determined to be an appropriate bargaining unit, and reiterated its position at the bargaining unit hearing, Singer refused the request.

At about the same time, one of the Union's business agents, a certain Mr. Howard Fedor, communicated with two Singer employees, Mr. Arnold Henry Metzner, then assistant manager (sales representative) of the Mt. Lebanon, Pennsylvania, store, and Mr. Leonard Carnathen, an assistant manager of the McKeesport, Pennsylvania, store. Mr. Metzner was told by Mr. Fedor that "it was necessary for him [Fedor] to get signed cards from the employees of the shops as the Labor Board was interested in including all shops in Allegheny County in its decision and that he, Fedor, wanted these cards 'real bad'." Fedor gave Metzner a stack of Union cards and asked him to have the employees at the Mt. Lebanon and Carnegie stores sign them. Fedor further stated that he was to get the employees from the McKeesport shop signed up. Metzner took the cards, and only two employees signed them indicating any show of interest for the Union. With regard to Carnathen, Singer proffered proof that Fedor informed Carnathen that it was necessary for the Union to sign up employees of the Carnegie, Mt. Lebanon and McKeesport shops, "since the Board wanted to include all the shops in Allegheny County in the unit."

Additionally, Singer sought to have issued a subpoena ad testificandum, directed to Mr. John J. Connerton, to testify at the unfair labor practice hearing as to the part he played, as set forth above. Mr. Connerton filed a petition to revoke

the subpoena on the ground that he was under the control of the General Counsel of the Board, and that the latter had not granted the requisite permission to testify, in accordance with § 102.118 of the Board's Rules and Regulations, so that Mr. Connerton was precluded from testifying. The Regional Director referred the petition to revoke the subpoena to the trial examiner for ruling, and the trial examiner ruled that the motion to revoke the subpoena should be granted, on the grounds that the testimony was "immaterial to the issues in the case," in that interrogation of Mr. Connerton was barred by the Board's rules, and by those court decisions which preclude inquiry into the mental processes of administrative officials in the discharge of their official and quasi-judicial functions.

Singer argues that the proffered testimony, together with the other facts and circumstances, establish that the Regional Director first determined that a unit based mainly on a geographical basis, i. e., Allegheny County, Pennsylvania, was the appropriate one, that he informed the Union, which then attempted to organize the remaining three shops in Allegheny County not included in the Pittsburgh City District, but, when the Union failed to organize these shops, the Regional Director reverted to the Pittsburgh City District as the appropriate unit, and in doing so relied upon the extent of organization as the controlling factor.

There can be little doubt that if the evidence establishes that the extent of union organization was the controlling factor in the selection of the Pittsburgh City District as the appropriate unit, the resulting order finding the refusal to bargain to be an unfair labor practice is invalid, Overnite Transportation Company v. N. L. R. B., 327 F.2d 36 (4 Cir. 1963); N. L. R. B. v. Quaker City Life Insurance Company, supra; General Instrument Corporation v. N. L. R. B., supra; National Labor Rel. Bd. v. Morganton Full Fash. Hos. Co., supra; National Labor Rel. Bd. v. Glen Raven Knitting Mills, supra.

At the unfair labor practice hearing, in addition to the ruling on vacating the subpoena, the Board ruled the proffered evidence inadmissible as (a) in violation of the mental process rule and (b) on the ground that, even giving the evidence full weight, it would establish only that the extent of organization was a factor—but not a controlling factor—permissible under the Act and cases construing it, Overnite Transportation Company v. N. L. R. B., supra; N. L. R. B. v. Quaker City Life Insurance Company, supra, but would fail to prove the extent of organization a controlling factor, impermissible by the authorities cited above. In this Court the Board advances these same reasons, as well as a contention that Singer is estopped to assert any contention based upon the rejected evidence, because Singer failed to call attention to the evidence and assert the contention before the Board when Singer sought review of the Regional Director's unit determination.

Assuming, as we must, that the witnesses will testify as their evidence was proffered, we believe that their testimony would show that extent of organization was the controlling factor in the unit determination, and it would be no answer to the invalidity of an order having such a basis that the other factors which we have discussed in this opinion would support the unit determination which was made. Indeed, as said in the Glen Raven Knitting Mills case, supra, where the question for determination was whether knitters could constitute an appropriate unit for separate bargaining, and where there was evidence that the knitters were a homogeneous group, but also evidence that the selection of the knitters as the appropriate unit followed only after repeated abortive efforts to organize a larger group of employees (p. 416 of 235 F.2d),

" * * * It is no answer to say that the knitters as a group possess certain characteristics that warrant

their certification as a separate unit; and therefore, the Board acted within the scope of its authority. We may not isolate these circumstances from the rest of the case and deal with a purely theoretical situation. We must consider the evidence as a whole, and when this is done there can be no reasonable doubt that the Board's action was controlled by the extent to which the employees of the company had been organized. * * * "

Thus, we must consider whether it was proper for the Board to reject the evidence and vacate the subpoena on the grounds of estoppel, the mental process rule, or the regulations of the Board with respect to testimony of its employees.

■ We see no merit in the Board's contention that Singer is estopped to present the evidence. As we understand the Board's argument, it is one more of waiver than of estoppel, but under either theory there is no showing in the record as to when, after the close of the representation hearing on June 27, 1961, or when, after the August 25, 1961 unit determination, the officers of Singer became aware of the activities of Fedor, and grasped the conjunctive significance of Fedor's activities and Connerton's activities. Nor does the record show when Singer sought Board review of the unit determination. The record is clear that at the unfair labor practice hearing Singer sought to present the evidence in this regard and asserted its contentions based thereon. This case is thus unlike Pittsburgh P. Glass Co. v. National Labor Rel. Bd., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941), cited by the board, which sustained the Board's refusal to permit the employer to present at the unfair labor practice hearing evidence which was available, pertinent and not presented at the unit hearing. In the instant case, Singer's complaint is based solely upon evidence of events which occurred after the unit hearing and, thus, was not available at the representation hearing. National Lab. Rel. Bd. v. Southern Bleachery & Pr. Wks.,

257 F.2d 235 (4 Cir. 1958), cert. den. 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959), and National Labor Rel. Board v. West Kentucky Coal Co., 152 F.2d 198 (6 Cir. 1945), cert. den. 328 U.S. 866, 66 S.Ct. 1372, 90 L.Ed. 1636 (1946) are also not on point. They, too, relate only to evidence not adduced at the representation hearing which was then available. Utica Observer-Dispatch v. National Labor Rel. Bd., 229 F.2d 575 (2 Cir. 1956), is also inapplicable because it relates to the presentation of evidence in an enforcing court and requires a petition to the Board to reopen the record before it. Singer, here, unsuccessfully sought the Board's consideration of its evidence.

■■ We do not think that the proffered testimony was properly rejected or that the subpoena was properly revoked on the basis of the mental process rule. The rule could have no application to testimony from Singer's employees, so that there need be considered only the question as to whether Connerton should have been prevented from testifying. The mental process rule protects the secret mental processes of those who, acting in a judicial or quasi-judicial capacity, make decisions as to facts or as to law. See, e. g., Chicago, B. & Q. R. Co. v. Babcock, 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636 (1907). The rule has been applied to federal administrative officials who act in a quasi-judicial capacity, United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); DeCambra v. Rogers, 189 U.S. 119, 23 S.Ct. 519, 47 L.Ed. 734 (1903); Norris & Hirshberg v. Securities and Exchange Com'n, 82 U.S.App.D.C. 32, 163 F.2d 689, 693 (1947); National Labor Relations Board v. Air Associates, 121 F.2d 586 (2 Cir. 1941); Walled Lake Door Company v. United States, 31 F.R.D. 258 (E.D.Mich.S.D.1962).

Although not urged on us by the Board, United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), is often cited as a leading case stating

and applying the mental process rule. We do not construe the language of this so-called fourth Morgan case as proscribing, under all circumstances, the probing of mental processes, United States v. Morgan, supra, pp. 421–422 of 313 U.S., pp. 1004–1005 of 61 S.Ct., pp. 1435–1436 of 85 L.Ed. There, the Court, by Mr. Justice Frankfurter, said:

"Over the Government's objection the district court authorized the market agencies to take the deposition of the Secretary. The Secretary thereupon appeared in person at the trial. He was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates. His testimony shows that he dealt with the enormous record in a manner not unlike the practice of judges in similar situations, and that he held various conferences with the examiner who heard the evidence. Much was made of his disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary 'has a quality resembling that of a judicial proceeding.' Morgan v. United States, 298 U.S. 468, 480 [56 S.Ct. 906, 80 L.Ed. 1288]. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that 'it was not the function of the court to probe the mental processes of the Secretary.' 304 U.S. 1, 18 [58 S.Ct. 773, 776, 82 L.Ed. 1129]. Just as a judge cannot be subjected to such a scrutiny, compare Fayerweather v. Ritch, 195 U.S. 276, 306–07 [25 S.Ct. 58, 49 L.Ed. 193], so the integrity of the administrative process must be equally respected. See Chicago B. &

Q. Ry. Co. v. Babcock, 204 U.S. 585, 593 [27 S.Ct. 326, 51 L.Ed. 636]. It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other."

Our view of the fourth Morgan case is supported by several considerations. In the fourth Morgan case, the quoted statement was made at a final stage in the litigation after all claims of procedural and constitutional irregularity had been put to rest and, thus, when the only remaining question was that of the correctness of the Secretary's determination under all of the evidence which had been adduced. In an earlier stage of the litigation, Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), when there had been more than a colorable claim of procedural irregularity, examination of the Secretary, and the receipt of other evidence, to determine if there had been a denial of a constitutional right was relied on in support of the conclusion that the hearing was fatally defective.

We find support, also, in the result in the first and second Accardi cases, United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), and Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955). In the first Accardi case, an alien, who was ordered to be deported, claimed that his application for suspension of deportation was denied by the Board to which it was referred, because the Board had prejudged his case. The prejudice, it was contended, resulted from the circulation by the Attorney General prior to the Board's decision of a confidential list of "unsavory characters," which included his name. The right of the alien to establish these facts, in a proceeding for the issuance of a writ of habeas corpus, was upheld. After examination of the

Board members, their testimony was relied upon in the second Accardi case to support the conclusion that Accardi had failed to prove his case.

 It is our opinion, therefore, that the mental process rule is but "one facet of the general presumption of regularity" which attaches to decisions of administrative bodies, 2 Davis, Administrative Law (1958), § 11.06, p. 63. Thus, we conclude, where a prima facie case of misconduct is shown, justice requires that the mental process rule be held inapplicable. Shaughnessy v. United States ex rel. Accardi, supra; United States ex rel. Accardi v. Shaughnessy, supra; Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); National Labor Relations Board v. Ford Motor Co., 118 F.2d 766, 768 fn. 2 (9 Cir. 1941); Union Savings Bank of Patchogue, New York v. Saxon, 209 F.Supp. 319 (D.C.1962). Cf. National Labor Relations Board v. Donnelly Garment Co., 330 U.S. 219, 229, 67 S.Ct. 756, 91 L.Ed. 854 (1947), and see generally, Clark v. United States, 289 U.S. 1, 13–14, 53 S.Ct. 465, 77 L.Ed. 993 (1933). As we have previously said, the only inference to be drawn from the record in its present state, including a consideration of the proffered testimony, is that there has been a violation of § 9(c) (5), 29 U.S.C.A. § 159(c) (5), so that it follows that the mental process rule is inapplicable to Mr. Connerton.

The claim that the Board may limit the scope of inquiry before it, and before this Court, under the facts and circumstances shown here, by its regulation adopted under the so-called "Housekeeping Statute" [3] merits little consideration. We believe that here, Singer has established prima facie by its proffered evidence that there was an actual violation of § 9(c) (5) of the Act, 29 U.S.C.A. § 159(c) (5), so as to render highly pertinent the testimony of Mr. Connerton as to whether he participated in any violation of the law on the Board's behalf and thus to overcome any policy in favor of the Board's right of non-disclosure, United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); N. L. R. B. v. Capitol Fish Co., 294 F.2d 868 (5 Cir. 1961). In short, Singer satisfies us that the search for truth is more important in this case than the policy of the Board in protecting Mr. Connerton from testifying and in protecting the actual basis on which the Board's certification of the Pittsburgh City District rests.

Because the Board erroneously excluded evidence which it should have received and erroneously revoked a subpoena and thus prevented a witness from testifying who should have been made available for examination, it follows that enforcement of the order must be denied, and the matter remanded to the Board for further proceedings consistent with this opinion.

Enforcement denied.

---

3. 5 U.S.C.A. § 22, which provides:
 "§ 22. Departmental regulations. The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it."
 The regulation adopted, § 102.118 of the Board's Rules and Regulations, 29 C.F.R. § 102.118 insofar as pertinent, provides:
 " * * * Whenever any subpena *ad testificandum* or subpena *duces tecum*,

the purpose of which is to adduce testimony or require the production of records as described hereinabove, shall have been served upon any such persons or other officer or employee of the Board, he will, unless otherwise expressly directed by the Board or the chairman of the Board or the general counsel, as the case may be, move pursuant to the applicable procedure whether by petition to revoke, motion to quash, or otherwise, *to have such subpena invalidated on the ground that the evidence sought is privileged against disclosure by this rule * * *."* (Emphasis supplied.)