32 N.Y.2d 314 (1973)
In the Matter of the Long Island College Hospital, Respondent-Appellant,
v.
New York State Labor Relations Board, Appellant-Respondent; Local 144, Hotel, Hospital, Nursing Home and Allied Service Employees Union, SEIU, AFL-CIO, Intervenor-Appellant-Respondent.
Court of Appeals of the State of New York.
Argued March 20, 1973.
Decided May 3, 1973.
Martin D. Heyert, T. R. Iserman, F. T. Shea and Eugene T. D'Ablemont for respondent-appellant.
Norbert M. Phillipps, Robert T. Snyder and Steven W. Davis for appellant-respondent.
Judith P. Vladeck for intervenor-appellant-respondent.
Judges BURKE, BREITEL, JASEN, GABRIELLI, JONES and WACHTLER concur.
*319 Chief Judge FULD.
In 1963, Local 144, Hotel, Hospital, Nursing Home & Allied Service Employees Union filed a representation petition with the New York State Labor Relations Board seeking certification as the exclusive bargaining representative of service and maintenance employees of Long Island College Hospital. Following hearings, the board directed two elections among the employees involved. One was among the service employees; they did not select a bargaining representative and so much of the petition as involved them was dismissed. The second election was conducted among the hospital's skilled maintenance employees. They voted (1) to bargain as a separate unit, limited to such employees and (2) to be represented for the purpose of collective bargaining by the union.
On objections to the elections filed by both the union and the hospital, the board conducted an informal investigation. It concluded that the objections were insufficient on their face and, in any event, that there was insufficient evidence to warrant a hearing. The board thereupon (in December, 1964) certified Local 144 as the exclusive bargaining representative of the skilled maintenance employees. The hospital disputed the board's certification on various grounds and refused to bargain with the union. Instead of filing an unfair labor practice charge against the hospital on that ground under the State Labor Relations Act *320 (Labor Law, § 704, subd. 6), the union invoked the mediation, fact-finding and compulsory arbitration proceedings of section 716, which the Legislature had made available to hospital employees when, in the course of bringing nonprofitmaking hospitals under the jurisdiction of the board in 1963 (§ 715), it enacted legislation prohibiting strikes by such employees (§ 713). The hospital thereupon brought an action which in effect sought to restrain proceedings under section 716. When the matter came before our court in 1968, we decided in favor of the hospital, holding that the proper procedure was for the union to file a refusal to bargain charge and that the arbitration order of the Industrial Commissioner was to be stayed until the union's certification had been judicially reviewed and found valid and enforceable. (Long Is. Coll. Hosp. v. Catherwood, 23 N Y 2d 20, app. dsmd. 394 U. S. 716.)
In accordance with our decision in that case (23 N Y 2d 20, supra), Local 144 filed its unfair labor practice  refusal to bargain  charge with the board, and thereupon a formal complaint was issued against the hospital. At the hearings which followed, the hospital not only attacked the board's original certification order of 1964, determining that the skilled maintenance workers constituted an appropriate bargaining unit, but interposed new matters concerning, among other things, alleged improprieties in the conduct of the election. After thorough consideration of these issues, the board adhered to its earlier decision and entered an order, dated June 30, 1971, which directed the hospital to cease and desist from refusing to bargain with Local 144 and extended its certification for one year from the date of its order or from the completion of any judicial review of that order.
On appeal, the Appellate Division, by a divided court, annulled the board's order and directed a new election (39 A D 2d 913). Although the court unanimously upheld as proper (1) the board's decision to have a self-determination election only among the hospital's skilled maintenance employees, (2) the board's use of a multi-question ballot and (3) its method of tallying the votes, a majority refused to confirm the board's certification and its bargaining order on several grounds: the ballot should have been bilingual and not solely in English; there were insufficient Spanish-language notices of election for distribution *321 to the maintenance workers; and the union's "Special Edition" of its publication contained inaccuracies and was distributed at a time when the hospital could not make an effective reply.
I. Appropriateness of Unit
The Appellate Division was eminently correct insofar as it affirmed the board's determination that the hospital's skilled maintenance employees constituted an appropriate bargaining unit. The board has an exceedingly broad discretion in fixing appropriate bargaining units. (See, e.g., Matter of Metropolitan Life Ins. Co. v. New York State Labor Relations Bd., 280 N.Y. 194, 209; Pittsburgh Glass Co. v. Board, 313 U. S. 146, 165-166; Packard Co. v. Labor Bd., 330 U. S. 485, 486, 491.) As the Supreme Court declared in the Packard Co. case (330 U. S., at p. 491), "The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed." Indeed, when this case was previously before us, we stated in no uncertain terms that "questions as to representation, including any issue as to the appropriate bargaining unit, call particularly for the expert judgment of the Labor Board. As we wrote in Matter of Levinsohn Corp. (Joint Bd. of Cloak, Suit, Skirt & Reefer Makers' Union) (299 N.Y. 454, 466), in speaking of the powers of the National Labor Relations Board to deal with representation issues  and this applies with equal force to the State Labor Board  `The Federal courts have uniformly recognized that because of the complexity and difficulty of the problem of designating the appropriate unit, the power to make the decision has been delegated exclusively to the expert judgment of the board which has wide discretion in making the determination'" (23 N Y 2d, at pp. 34-35).
Since the determination of an appropriate bargaining unit "is more nearly `legislative' than `adjudicative'" (Utica Mut. Ins. Co. v. Vincent, 375 F.2d 129, 134, cert. den. 389 U. S. 839), the judicial review to which it will be subjected is narrow and circumscribed. The question posed is this: is the determination "arbitrary" or "capricious," not is it supported by *322 substantial evidence. (See Matter of Metropolitan Life Ins. Co. v. New York State Labor Relations Bd., 280 N.Y. 194, 209, supra; May Stores Co. v. Labor Bd., 326 U. S. 376, 380; Foreman & Clark, Inc. v. National Labor Relations Bd., 215 F.2d 396, 405-406, cert. den. 348 U. S. 887; N. L. R. B. v. Tennessee Packers, Inc., Frosty Morn Div., 379 F.2d 172, 182, cert. den. 389 U. S. 958.)
It is for the board to establish "in each case" an "employer unit, multiple employer unit, craft unit, plant unit, or any other unit" (Labor Law, § 704, subd. 2). Although it may well be that more than one unit might properly be found appropriate, it is settled by numerous cases, decided under the National Labor Relations Act  and there is no reason for a different rule under the State act  that "the Board has the responsibility of making [that] determination." (General Instrument Corp. v. N. L. R. B., 319 F.2d 420, 423, cert. den. 375 U. S. 966; see, also, Corrie Corp. of Charleston v. N. L. R. B., 375 F.2d 149, 154; Packard Co. v. Labor Bd., 330 U. S. 485, 491, supra; Overnite Transp. Co. v. N. L. R. B., 327 F.2d 36, 39.) The record before us reveals the board's care in determining that the hospital's skilled maintenance employees was the appropriate bargaining unit. Not only did the board conduct a general public hearing concerning the problems involving appropriate bargaining units at hospitals, during which the opinions of both employers and unions in the field were received but also, in several individual representation proceedings  including one involving the very hospital before us  it conducted lengthy hearings at which the parties were afforded an opportunity to present evidence relating to unit issues.[1]
*323 Without merit is the hospital's argument that the unit selected may improperly fragment the hospital into numerous small units. Not only does the statute not preclude "fragmentation" but it declares that, in establishing an appropriate unit, the guide is that the board "insure to employees the full benefit of their right to self-organization, to collective bargaining and otherwise * * * effectuate the policies of this article" (Labor Law, § 705, subd. 2). This is accomplished at times by establishing a small bargaining unit limited to those employees who constitute a homogeneous group and desire the benefits of collective bargaining. (See, e.g., Matter of Liberty Maimonides Hosp., 29 NYSLRB 464, 466-467; Matter of Carson C. Peck Mem. Hosp., 32 NYSLRB 323, 326-327.) Actually, the board's practice in allowing skilled maintenance employees in hospitals to form a separate bargaining unit if they wish to do so, far from constituting over-compartmentalization, has avoided more serious fragmentation into numerous smaller units since, under the mandatory craft unit provision of subdivision 2 of section 705, each skilled craft, such as plumbers, painters and carpenters, could have demanded and could have been included in a separate unit. Accordingly, the board's practice, resulting in the establishment of a separate bargaining unit of skilled maintenance employees, was fully justified and, certainly, may not be stamped as either arbitrary or capricious.
II. Conduct of Election
Nor, in our view, is there any valid basis for the hospital's attack on the conduct of the election  viz., the form of the ballot, the tabulation of the votes and the union's election campaign literature.
Section 705 (subd. 4) of the State Labor Relations Act provides that "The board shall have power to determine who may participate in the [representation] election and to establish the rules governing any such election". The board is an important *324 governmental agency vested with the exclusive authority and responsibility of determining the procedure to be used in conducting representation elections, and its determination should not be set aside where there is substantial evidence to support its findings of fact. (See, e.g., Matter of Roosevelt Hosp. v. New York State Labor Relations Bd., 27 N Y 2d 25, 32; Railway Clerks v. Employees Assn., 380 U. S. 650, 667; Labor Bd. v. Tower Co., 329 U. S. 324, 330; Labor Bd. v. Waterman S. S. Co., 309 U. S. 206, 226; N. L. R. B. v. Olson Bodies, Inc., 420 F.2d 1187, 1189.) As the Federal Court of Appeals observed in the Olson Bodies case (420 F.2d 1187, 1189, supra), "The conduct of representation elections is the very archtype of a purely administrative function, with no quasi about it, concerning which courts should not interfere save for the most glaring discrimination or abuse."
A. Language, Form and Tally of the Ballots
The hospital urges that the ballot should not have been only in English since some of the voters were Spanish-speaking and that the form of the ballot  its inclusion of three questions to be voted on  was complex and confusing.
1. Language of ballot
In the light of the principles stated above, there can be no doubt that the board was justified in concluding that the voters had sufficient command of the English language to understand the ballot. In the first place, no maintenance employee testified, or even complained, that he was unable to read English or to understand the ballot. And, in the second place the hospital actually agreed at a pre-election conference that the ballot for the maintenance employees need only be in English. In view of this, we do not consider of any moment the fact  mentioned in the Appellate Division's opinion (39 A D 2d, at p. 913)  that the union's "Special Edition" of its publication, "Bulletin" (see, infra, p. 326 et seq.), was partially printed in Spanish. As is apparent, the board's determination is founded on substantial evidence, and no warrant exists to nullify the agency's conclusion that the English-language ballot was proper.
2. Form of ballot
The entire Appellate Division explicitly stated that "we do not find the board's decision to employ the multi-question ballot *325 to be arbitrary or inherently confusing" (39 A D 2d, at p. 913).[2] As bearing on the propriety of that determination, we note that the type of ballot now before us was adopted by the board in 1964 (see Matter of Wyckoff Hgts. Hosp., 27 NYSLRB 75, 86, supra) and has since been utilized in numerous representation elections. Of high significance is the fact that not a single voter in this case had informed the board that he was confused or did not understand the meaning of the ballot. Moreover, as the board's decision recites, notices of the election were posted and sample ballots distributed  thereby enabling the employee-voters to familiarize themselves with its form  and the hospital itself "conducted about 10 meetings, attendance at which was compulsory, during which employees were thoroughly instructed in the mechanics of voting. The meetings were conducted by Donald D. Rowe, a communications consultant retained by [the Hospital], who testified at the meetings `* * * there was a great deal of emphasis on what the election would be all about, what the procedures would be, how they would vote, why it was important for them to vote, what the vote would determine, all the details of the election.'" And, continued the board, "[w]e are satisfied that the employees had full knowledge of the nature and meaning of the ballot, and had no reasonable basis for being confused." That conclusion is manifestly supported by substantial evidence.
3. Tally of ballots
The Appellate Division also rejected the hospital's contention that the board's method of counting the votes was improper, *326 and there can be no doubt of the correctness of that conclusion. The first question on the ballot asked whether the skilled maintenance employees wanted a separate bargaining unit (see, supra, p. 325, n. 2). Of 47 skilled maintenance workers who went to the polls, 21 voted in favor of a separate unit and 5 against it. Twenty ballots were left blank and 1 was challenged and, in accordance with its long-settled practice, the board excluded from the tabulation those 21 ballots. Since the valid votes were 21 "yes" to 5 "no," the board certified that a majority desired the separate unit of skilled maintenance employees. This was entirely and unimpeachably correct. The board was not required  contrary to the hospital's insistence  to treat the blank ballots as negative votes, that is, to regard the "non" votes as "no" votes. The board was fully justified in counting only validly marked ballots and not taking into account blank, void or challenged ballots in arriving at a final tabulation.
It follows from what has already been written that the board's tally of the vote on question 2 (see, supra, p. 325, n. 2) is equally immune from successful attack. On that question, 24 of the 47 maintenance employees who went to the polls voted in favor of Local 144, 4 in favor of the other named bargaining representative and 16 for "neither." It is apparent, therefore, that Local 144 won by a majority of 4. In any event, though, even if the blank and challenged votes had been counted against the union, it still would have had a majority of one and, by that token, was entitled to certification as the exclusive bargaining representative. (Labor Law, § 705 [subd. 1]; see, also, Matter of Roosevelt Hosp. v. New York State Labor Relations Bd., 27 N Y 2d 25, 32, supra; Labor Bd. v. Tower Co., 329 U. S. 324, supra; N. L. R. B. v. Olson Bodies, Inc., 420 F.2d 1187, supra.)
4. Distribution of union's "Special Edition"
The hospital objects to the union's distribution to its service and maintenance employees, on the evening of July 20, 1963, about a day and a half before the election, of a "Special Edition" of its "Bulletin." After a detailed analysis and discussion, both the trial examiner and the board overruled the objection. However, the Appellate Division majority, as one *327 of its reasons for reversing the board, stated that "the `Special Edition' contained inaccuracies and was distributed at a time when, in our opinion, petitioner could not make an effective reply" (39 A D 2d, at p. 913). Justice SHAPIRO, in dissent, took a different view, and we agree with him that "it is not [the board's] function `to censor every sentence or phrase of campaign rhetoric, or to try to fix the precise amount of allowable hyperbole.' Its conclusion that Local 144's `Special Edition' was not likely to substantially mislead the voters when taken in context with all that preceded and followed is supported by substantial evidence. Further, the evidence indicates that petitioner made a deliberate decision not to reply to the `Special Edition' even though it had both the ability to publish a reply and the factual material available with regard to most, if not all, of the alleged misrepresentations" (p. 914).
It is well to bear in mind that the pre-election campaign was long and hard fought by both Local 144 and the hospital. During the week immediately preceding the election, each of the parties issued charges and countercharges; leaflets and circulars were distributed; telegrams and answering telegrams were sent out. In a series of 9 or 10 meetings called by the hospital administration, the hospital stressed the expense of joining the union. At several of the meetings  attended by the hospital's communications specialist (Donald Rowe)  reference was made to contracts that the union had with other hospitals, and extracts were read from the agreements then in effect with Jamaica Hospital and Doctors Hospital.
It was in this context that the union sent a telegram to the hospital on the evening of July 20 and commenced distribution shortly thereafter of a single-page leaflet setting forth the telegram and the "Special Edition" of its "Bulletin."[3] Most of the claimed misrepresentations related to wage and fringe benefits contained in the Jamaica Hospital and Doctors Hospital contracts. Although those agreements had long been in possession of the hospital, instead of issuing a statement to its employees, pointing out the specific areas in which it claimed *328 the union had misstated the terms of those contracts, the hospital sent an answering telegram and commenced distribution, at about midnight, of a flyer to all employees setting forth its telegram.[4] The hospital's administrator, its communications specialist and its attorney discussed the union's "Special Edition" at about midnight on July 20. However, the hospital did not prepare or distribute any additional response. It seems clear that it was satisfied with what it had already done; having informed the employees that the Doctors Hospital and the Jamaica Hospital contracts did not support the union's claims with respect to them, the hospital obviously decided that the employees had sufficient information to make a reasoned judgment when they came to vote.
It is our judgment that substantial evidence supports the board's finding that the "Special Edition" did not mislead the voters. As bearing on this, it is of considerable significance that, although the pre-election campaign literature, including the "Special Edition," went to both the skilled maintenance employees and the service employees, the latter group  consisting of some 550 eligible voters as compared with 55 employees in the maintenance group  voted overwhelmingly against the union. Moreover, as already stated, since the hospital had in its possession the detailed facts with respect to two hospital contracts, it could have presented them to the employees to counteract what it believed to be misstatements in the "Special Edition." Having chosen not to avail itself of that opportunity, the hospital is hardly in a position now to urge that the election be set aside on the ground that it had no adequate opportunity to answer the union's "Special Edition." (See, e.g., N.L.R.B. v. Louisville Chair Co., 385 F.2d 922, 927, cert. den. 390 U. S. 1013.)
In concluding that the "Special Edition" was distributed at a time when the hospital could not make an effective reply, the Appellate Division substituted its judgment for that of the *329 board. This, of course, is impermissible where, as here, the board's findings of fact are supported by substantial evidence. (See Matter of Roosevelt Hosp. v. New York State Labor Relations Bd., 27 N Y 2d 25, 32, supra; Matter of Jernigan v. New York State Labor Relations Bd., 300 N.Y. 482; Matter of Stork Rest. v. Boland, 282 N.Y. 256, 267, 274.) In short, the board applied to the case before us its standard, unquestionably reasonable, that misrepresentations in pre-election campaigns would be a ground for setting aside the election only where they are material, involve facts exclusively within the knowledge of the party, are reasonably expected to have a significant impact on the voters and no oportunity exists for the challenging party to rebut the alleged misrepresentations. (See, e.g., Matter of Millard Fillmore Hosp., 28 NYSLRB 525, 527.) And, having regard for the entire pre-election campaign, its findings that Local 144 was not guilty of such misrepresentations or inaccuracies as to warrant setting aside the election and that the hospital deliberately chose not to reply, despite the opportunity to do so, are supported by substantial evidence.
It is only necessary to add that there is no basis whatever for criticism of the union for its asserted delay in failing to file an unfair labor practice complaint (39 A D 2d, at p. 913). As our court unequivocally stated in the Roosevelt Hospital case (27 N Y 2d 25, 34, supra), "Delays occasioned by the union's exercise of what it reasonably believed to be its right under the statute [to invoke the mediation, fact-finding and compulsory arbitration proceedings of section 716] did not call for a redetermination of its status as a representative any more than would delays resulting from the slowness of administrative action or from an employer's pursuit of his judicial remedies in seeking court review of the board's certification. [Cases cited.]" Moreover, as the court went on to observe in that case (27 N Y 2d, at p. 35)  and it is equally applicable in the present one  "What occurred here * * * is not likely to occur again, now that the procedure to be followed in this type of situation has been definitively set forth in this court's Long Island College Hospital decision (23 N Y 2d 20, supra) and in the Legislature's recent clarifying amendments to section 716 of the Act (L. 1969, ch. 526, §§ 2, 3)."
*330 The order of the Appellate Division should be reversed, with costs, the board's bargaining order reinstated and the cross petition for enforcement of that order granted in its entirety.
Order reversed, etc.
NOTES
[1] After noting that, where a separate unit of skilled maintenance employees has been sought, it found "weighty considerations both for, and opposed to, the establishment of such a separate unit," the board went on to say  quoting from Matter of Wyckoff Hgts. Hosp. (27 NYSLRB 75, 82-83)  "`On the one hand, they are a homogeneous group of skilled employees having relatively higher earnings and no interchange with the service employees. * * * On the other hand, there is our policy against over-compartmentalization of hospitals into numerous small bargaining units, and prior Board decisions * * * finding maintenance and service units appropriate in hospitals. * * * We find that these factors are equally balanced. Under these circumstances, especially the fact that the engineer-maintenance employees perform types of services identified with traditional trades and crafts, we believe that the as yet unexpressed desires of these employees should be determinative. Accordingly, as we have done in similar situations, we shall ascertain, by a self-determination election, the desires of the engineer-maintenance employees as to whether they prefer to bargain in a separate unit, or in a larger unit including the service employees.'"
[2] The three questions which the voters were asked to answer, each with a single "x" mark, are these:

"1. Do you want a separate bargaining unit limited only to maintenance of plant an engineering department employees? (to be answered `Yes' or `No').
"2. If there is a separate unit of maintenance of plant and engineering department employees, do you then desire to be represented for the purposes of collective bargaining by Maintenance Division [no longer a party to these proceedings] or by Local 144, or by neither?
"3. If there is a combined unit of maintenance of plant and engineering department employees and service employees, do you then desire to be represented for the purposes of collective bargaining by Local 144? (to be answered `Yes' or `No')."
[3] The union's telegram and leaflet recited, in part: "Local 144 is prepared to debate the issues before workers and let them decide who is telling the truth. Local 144 is prepared to bring copies of its contracts to such debate to prove accuracy of its statements. Suggest debate be held Tuesday July 21 at 1 p.m."
[4] The hospital's response included the following: "Your organizers have been handing out anti propaganda to our employees for more than a year now. Tomorrow, July 21, have them distribute copies of Local 144's contracts with Doctors and Jamaica Hospitals. Failure to do so will in the eyes of our employees be positive proof that you are hiding important facts from them." (Emphasis in original.)